## WOODLAND *v.* WOODLAND.

1. " A decree of divorce in another State, in which the custody of the child is awarded to the father, is conclusive as between the parties to the decree, as to his right and fitness for such custody at that time, but is not conclusive for all time. In a subsequent proceeding by habeas corpus for the possession of the child, between the parties to the decree, evidence as to the unfitness of the father will be confined to matters transpiring subsequently to the decree."

2. In habeas-corpus cases the trial judge has a wide discretion, within legal limits, as to the custody of minor children, the paramount consideration being the welfare and happiness of the minors.

3. Under the evidence in the present case there was no abuse of discretion in awarding the minors to the mother.

Nos. 2864, 2865, 2866, 2867. APRIL 11, 1922.

Habeas corpus. Before Judge Pendleton. Fulton superior court. September 22, 1921.

*Reuben R. Arnold, Lowry Arnold, Edward C. Hill,* and *Herman B. Evins,* for plaintiff in error. *Len. B. Guillebeau,* contra.

HILL, J.　Robert E. Woodland and Florence Linder Woodland were married in January, 1917, at Tampa, Florida.　Two children were born of this marriage, a boy, John Gayton Woodland, in December, 1917, and Margaret Means Woodland, a girl, was born June 13, 1919.　The plaintiff and the defendant lived together as husband and wife until March, 1920, when they separated.　The controversy in the present case is over the possession and custody of the two children.　It appears from the record that while the children were in the custody of their mother at her home at Cape May, New Jersey, they were kidnapped and taken from their mother on July 7, 1921.　After a period of search the boy was located in a boarding-house in the city of Atlanta, where he had been placed by his father.　The mother filed a petition for habeas corpus against her husband, seeking to recover the custody of the minor son.　Subsequently to the filing of this suit and before the trial of the case the mother, by the aid of detectives, located the girl in the possession of two people living in Battery Park, Virginia.　She went to Virginia, secured possession of the minor, and brought her to Atlanta, where the husband filed his petition for habeas corpus against his wife for the custody of the little girl. In his petition, and also in his answer to the petition of Mrs. Woodland, Mr. Woodland, the husband, claimed the right to the custody of both children under a decree of a Florida circuit court, a copy of which was set out in the brief of the evidence.　Both of these cases, involving the same issues, were tried together by Judge Pendleton of the superior court of Fulton County, who, after hearing evidence and argument in the case, awarded the custody of both children to the mother.　To each of these judgments the plaintiff in error excepted on what amounts to the usual general grounds, and also upon the ground that the trial court did not give full weight and credit to the decree of the Florida court which had awarded the children to the father, — the mother not having been present at the trial, and having left the State taking the children with her.　The cross-bill of exceptions assigns error on allowing the decree of the Florida court in evidence upon various grounds.　In the view we take of this case the controlling question is, whether the judgment of the lower court awarding the children

to the mother is contrary to the evidence and without evidence to support it.

In the case of *Milner* v. *Gatlin,* 139 *Ga.* 109 (76 S. E. 806), it was held: " A decree of divorce in another State, in which the custody of the child is awarded to the father, is conclusive as between the parties to the decree as to his right and fitness for such custody at that time, but is not conclusive for all time. In a subsequent proceeding by habeas corpus for the possession of the child, between the parties to the decree, evidence as to the unfitness of the father will be confined to matters transpiring subsequently to the decree." In *Milner* v. *Gatlin,* 143 *Ga.* 816 (85 S. E. 1045, L. R. A. 1916B, 977), Presiding Justice Evans, delivering the opinion of the court in a case somewhat similar in its facts to the present case, said: " The act of 1913 provides that in all cases of contest between the parents of children, for their custody, ' there shall be no prima facie right to the custody of such child or children in the father, but the court hearing such issue of custody may exercise its sound discretion, taking into consideration all the circumstances of the case, as to whose custody such child or children shall be awarded, the duty of the court being in all such cases, in exercising such discretion, to look to and determine solely what is for the best interest of the child or children and what will best promote their welfare and happiness, and make award accordingly.' This enactment applies to situations growing out of the domestic relation of husband and wife, as unaffected by any final divorce proceeding. Where there has been a divorce decree, in which disposition of the child has been made, that decree (where it is not successfully attacked for fraud in its procurement, under circumstances above pointed out) is binding on the parties, so as to conclude their respective rights to the custody of the children at the time of its rendition. As to conditions subsequently occurring, the judge of a habeas-corpus court has full discretion in awarding the custody of the child, and in the exercise of such discretion he may look to the circumstances relating to the child's ordinary comfort and contentment, its intellectual and normal development, and award the custody to either of the parents, according as it may be to the best interest of the child."

In the instant case there had been no decree of divorce in the Florida court or elsewhere, so far as the record discloses. But

subsequently to the rendition of the Florida decree new conditions had occurred which changed the status of the children. The evidence shows that the two children were kidnapped and taken away from their mother while she was living at Cape May, N. J., by persons who subsequently were identified as the brother of Mr. Woodland, and a woman who claimed to be his wife; and the little girl, who was only about two years old, was placed with the brother and the woman with whom he was living as his wife in Battery Park, Va. Mrs. Woodland testified: " When I first saw Margaret again it was when I found her at Battery Park, Va., last week. I found her at a neighbor's house. Mr. Guillebeau and the sheriff and prosecuting attorney of that county went with me. We found her with dirty clothes, very few clothes, and they were dirty. She had one little waist, panties, and apron, no shoes and stockings. As to her condition — she was dirty, wet, smelly; her body was dirty, smelled nasty as though she had not washed in several weeks. That was at Battery Park last Tuesday or Wednesday. The little undergarment was wet, nasty and dirty. She had lost her good training and good habits. When she went to the table she started to eat with her hands, a thing she never did when I had her. She complained of being hungry. We took her to a neighbor's house, and she ate a lot of crackers and milk like she was starved. At Battery Park I saw the woman I mentioned about Cape May, and talked with her. I do not know how she started the conversation, but the gist of it was she was the woman that took them from me that morning, supposedly to the beach. She admitted she took them to the beach, and said a strange man that she had never seen before had taken them away from her on the beach, and she went to the house and got her things and started from Cape May. She said little Margaret was placed in her arms, and he paid her $10 a week to take charge of Margaret. As to whether she named the party who placed Margaret in her arms — she said her father did, the father of Margaret. She said her father put her in her arms at Norfolk, Va. I did not see this woman when I first stopped there. She wore a dirty black dress, and was slovenly and dirty looking. Her hair was hanging down, and her waist seemed three or four inches apart. She had on dirty bedroom slippers, and looked like a tramp. At least 25 people, both men and women, in that town talked to me about the character of these folks. As to

the general character of these people in that community — just low down, common people. . . Their general character or reputation at that place is bad. The sheriff turned Margaret over to me. The commonwealth attorney was out there. He directed the sheriff to turn the child over to me. I gave her something to eat, and took her to the hotel and bathed her. Then I brought her here . . As to the provision I can make for them if the children are awarded to me — I have a home. It is in trust to me. It won't be given me as long as I am married to Mr. Woodland. After a divorce it is mine. That home is at Cape May, N. J. I have a permanent income of about $2,000 a year. I will inherit about $80,000 at my mother's death. As to the status of that property — she can not dispose of the principal. It is to go to me. If I die first it goes direct to the children. It will be mine in fee simple at her death. I have an uncle at Cape May who has rendered me financial assistance. He is very fond of the children, and has always done everything he could to help them and to help me when in any need at all. He has given me quite a little money, he is my great-uncle. He is a retired manfacturer, and has — I do not know what his property is worth, but he is very wealthy. I have been forced to spend about $3,000 in this search for my children. My uncle has helped me with that. He will help me more if it is necessary. I have cared for the children to the best of my knowledge; tried to raise them and train them as they should be raised and trained and taught; done everything in my power for them. I have never known Mr. Woodland to go to church but once, and that was before we were married, and he went to get the minister to come and marry us. He said paid ministers are hypocrites."

There was other evidence showing that during the few months that the father had the custody of the little boy, who was about four years old, he kept him in a boarding-house in Atlanta on South Ashby street, and none of the people with whom they boarded were related to him. On the trial of the case the father testified that if the children were awarded to him he could place them in this boarding-house in Atlanta, and that that was the only home he could offer them. He also testified that he had no property, real or personal, except a few hundred dollars, and that he had no income except his salary as a ticket-seller at the terminal station in Atlanta; and he also stated that if he should become too

ill to work, or should lose his position for any reason, the children would become objects of charity so far as he was concerned. But he also stated if he should lose his position he could get another one. He stated that his salary was $205 per month for a thirty-day month, and that if the children were awarded to him he would take them to 263 South Ashby street and place them there with friends, and that the mother and daughter of the household would look after them, and that he would simply board them out there. In addition to the above evidence it was shown by a witness, who knew Mrs. Woodland at Cape May, that she had a good reputation and also the reputation of being " a good mother." There were a number of witnesses who also testified as to the good character of the father.

Under this evidence, including the decree from the circuit court of Florida as applied to the ruling in the *Milner* case, supra, we think that the court below did not err in awarding the children to the mother. In habeas-corpus cases the trial judge has a wide discretion, within legal limits, as to the custody of minor children, the paramount consideration being the welfare and happiness of the minor. *Lamar* v. *Harris,* 117 *Ga.* 993 (44 S. E. 866) ; *Hammond* v. *Murray,* 151 *Ga.* 816 (108 S. E. 203) ; *Hollenbeck* v. *Glover,* 128 *Ga.* 52 (3) (57 S. E. 108). In view of the whole record and the evidence in this case we are of the opinion that the court did not abuse his discretion in awarding the children to the mother.

The court allowed in evidence, over objection, a copy of the decree of the circuit court of Florida awarding the children to the father; and we can not say that the trial court did not give full faith and credit due to that decree, as contended by the plaintiff in error. In view of the ruling made in the case of *Milner* v. *Gatlin,* 143 *Ga.* 816 (supra), and of the evidence in this case showing that the status of the children had materially changed subsequently to the rendition of the decree in the Florida case, we are of the opinion that the court did not err in awarding the children as he did. In the above view, it is unnecessary to consider the question as to whether or not the decree in the Florida case was null and void for the reasons assigned by the defendant in error in the cross-bill of exceptions.

*Judgment affirmed on both main bills of exceptions. Cross-bills dismissed. All the Justices concur.*