# Richmond

## JULIA ROGERS V. COMMONWEALTH OF VIRGINIA.

November 25, 1940.

Record No. 2317.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*Herman A. Sacks,* for the appellant.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

The lower court awarded the custody of twins, four years of age, to the Children's Bureau of the city of Norfolk. Julia Rogers, contending that she is entitled to the care and custody of these infants, prosecutes this appeal. She assigns three errors to the ruling of the trial court: (1) That the children were not "neglected and dependent;" (2) that the uncontradicted evidence discloses that her right to the custody of the children is superior to the right of the Commonwealth; and (3) that no court in Virginia has jurisdiction to determine the issue presented.

The first question to be determined is whether the infants are "dependent" or "neglected" children within the purview of chapter 78, sections 1905 et seq., of the Code.

 Code, section 1906, treats delinquent, dependent or neglected children in the disjunctive and not in the conjunctive, as stated in appellant's brief. Among the seven definitions given to the words "neglected child" is, "a child * * * who is found living in a house of ill fame or with vicious or disreputable persons." The last paragraph of this section begins: "All delinquent, dependent *or* neglected children, as defined in this chapter, shall be considered * * * wards of the State and in need of care and protection * * * ."

This action was instituted by a warrant issued on September 11, 1939. The officer who served the warrant stated that he found the children in a house of ill fame conducted by Elsie Morse. He saw women walking around in a semi-nude condition. The two little girls were dirty and no attention seems to have been paid to them. Elsie Morse is a notorious character in Norfolk and vicinity, as the police record shows that she has been arrested on various charges 68 times within the past fifteen years. It was stated that she had operated a chain of houses of ill fame during that period. It is difficult to conceive of more convincing evidence on the question of whether or not the children were "neglected" within the meaning of the statute quoted.

Consideration of the second assignment of error requires a more detailed study of the evidence. It appears that in 1935 one Anne Whitaker, an inmate of a house of prostitu-

tion conducted by Elsie Zick Morse, gave birth to the two infants. Elsie Morse paid her hospital expenses and a local doctor for his attention to her during confinement. Several witnesses in attendance upon the young mother stated that she did not care for her babies and that Elsie Morse, with her consent, removed them from the hospital within three days from the date of birth.

When the babies were three months old, Elsie Morse was charged with violation of the Federal narcotic law and, later, was sentenced to three years' confinement in the Federal penitentiary at Alderson, West Virginia. Before beginning to serve this sentence she "contacted Mrs. Julia Rogers, of Asheville, North Carolina, for the purpose of turning said children over to her." At this time Mrs. Rogers was informed that the children were the issue of Elsie Morse and Albert May, a son of Mrs. Rogers and a former husband of Elsie Morse. Mrs. Rogers took the children to Asheville, North Carolina, where they remained until sometime in 1939, when, as Mrs. Rogers testified, she brought the children to Norfolk, Virginia, and left them with Elsie Morse for a short stay while she visited her sick daughter in Richmond, Virginia. While the children were on this visit to Elsie Morse, their mother, Anne Whitaker, caused the warrant in this case to be issued.

Mrs. Rogers also stated that she was devoted to the infants, and that during the period—approximately three and one-half years—they were in her care in Asheville, North Carolina, she had spent approximately $1,500 in medical expenses and maintenance costs for them. Mrs. Rogers claims that she did not know the children were not her own grandchildren until that fact was brought out in the trial before the juvenile and domestic relations court of the city of Norfolk. Notwithstanding this fact, she contends that she loves them as though they were her own flesh and blood, and that she and her husband are well able and willing to properly maintain, support and educate them. Mrs. Rogers promised to make ample provision for them in case of her death, if their custody should be awarded to her. She

claimed to be ignorant of the character and reputation of her daughter-in-law, Elsie Morse, and that, while staying with her in Norfolk, she observed nothing improper in her conduct.

The evidence for the Commonwealth shows that Anne Whitaker had reformed and was living in a respectable neighborhood; that she had made several inquiries about the children; and that, when she ascertained that they were staying in Norfolk in a house of ill fame, she made a formal complaint and caused the infants to be brought before the juvenile and domestic relations court of the city of Norfolk. The judge of the domestic relations court awarded the custody of the infants to their mother. On appeal, Mrs. Elvira M. Wainwright, the director of the Children's Bureau, testified that, upon ascertaining that Anne Whitaker was living with a man to whom she was not married, she requested the circuit court to award the custody of the infants to the Bureau and not to the mother.

Mrs. Wainwright also testified that Albert May, the son of Mrs. Julia Rogers, and the former husband of Elsie Morse, appeared in the first trial of the case and falsely represented himself to be the father of the children. On cross-examination, he admitted that he was not the father and that he appeared in the proceedings as an agent for his mother, Mrs. Julia Rogers, and Elsie Morse. Mrs. Wainwright further said that, during the litigation in the domestic relations court and the circuit court, Mrs. Rogers stayed either at Elsie Morse's home or at the home of Mrs. Lockhart, on York street, and that Mrs. Lockhart was an associate of Elsie Morse in conducting houses of ill fame. She then said that Mrs. Rogers was ill-tempered, unreliable, emotionally unsound and not a fit person to have the guardianship of the infants.

The only evidence tending to show that Mrs. Rogers was financially able and morally fit to have the custody of the infants was the testimony of Mrs. Rogers herself and that of the notorious Elsie Morse.

In the oral argument it was stated, and not denied, that Elsie Morse was prosecuting the appeal in the name of Julia Rogers, and that the attorney assisting the Commonwealth was representing the mother, Anne Whitaker. These are interesting facts if true, but it is immaterial to the decision whether either of the statements is true, as the determining factor is the welfare of the infants and not the claims of either the mother or Mrs. Rogers.

The order entered by the judge of the juvenile and domestic relations court of the city of Norfolk states that the appeal to the circuit court was taken by Elsie Zick Morse. Part of the recital in the judgment from which this appeal was awarded reads: "Julia Rogers and Elsie Morse intervened, and neither party requesting a jury trial, the whole matter, both of law and fact, was heard and determined by the court." Further on in the same order this is stated: " * * * to which action the said Julia Rogers and Elsie Morse duly excepted." It thus appears that Mrs. Rogers and Elsie Morse have united forces for the purpose of depriving the Children's Bureau of the care and custody of the infants. It is difficult to believe that a woman as notorious as this evidence reveals Elsie Morse to be, and as frequently as she was committed to jail, could have concealed her true character from her mother-in-law for so many years.

Under the circumstances, and in the absence of any corroborating evidence on the issue of Mrs. Rogers' fitness to have the care and custody of the infants, we do not think the trial court committed error in awarding the custody to the Children's Bureau of the city of Norfolk.

Appellant contends that the children are not domiciled in Virginia. This contention is based on the gift of the children to Mrs. Rogers and her removal of them to Asheville, North Carolina.

In support of this contention appellant offered to file a copy of an order, dated September 26, 1938, entered by the juvenile court of Buncombe county, North Carolina, awarding the custody of the infants to Mrs. Rogers until the fur-

ther order of the court. The trial court sustained an objection to the introduction of this order on the ground that it was obtained by misrepresentation and fraud. As appellant concedes the correctness of this ruling, this rejected evidence may be disregarded.

A bastard child takes the domicile of its mother from birth. The domicile of origin continues until a new one is acquired. Any change in domicile must be established by the party who asserts it. *State-Planters Bank & Trust Co.* v. *Commonwealth,* 174 Va. 289, 6 S. E. (2d) 629. These infants were not adopted either by Elsie Morse or Julia Rogers. Anne Whitaker was a resident of and domiciled in Norfolk, Virginia, at the time the children were born. When their custody was transferred to Elsie Morse, she was a resident of the same city. She transferred the custody to Mrs. Rogers, a resident of Asheville, North Carolina, because she was then under a sentence of confinement. The finding of the children in Elsie Morse's custody so soon after her release from the penitentiary, and her close collaboration with Mrs. Rogers in this litigation are bits of evidence tending to show that Elsie Morse, a resident of Virginia, is the real party seeking custody of the infants.

The local court of an infant's legal domicile has jurisdiction to determine its custody. *Wilson* v. *Wilson,* 136 Va. 643, 118 S. E. 270. However, jurisdiction of such courts is not exclusive. See *Sheehy* v. *Sheehy,* 88 N. H. 223, 186 A. 1, 107 A. L. R. 635; *Finlay* v. *Finlay,* 240 N. Y. 429, 148 N. E. 624, 40 A. L. R. 937; *Martin* v. *Gardiner,* 240 Mass. 350, 134 N. E. 380. In Virginia the actual presence of the infants within the jurisdiction of the court is sufficient to determine the venue of the action. Code, section 1907, expressly authorizes any local juvenile and domestic relations court to determine the custody of any "neglected" child "who *resides in* or who *is actually within* a city or county of this State."

The decree of the trial court is

*Affirmed.*