## COLBY v. COLBY

(Two Appeals in One Record)

[No. 215, September Term, 1957.]

*Decided May 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-son, HAMMOND and HORNEY, JJ.

*N. B. Frost*, with whom were *Elizabeth R. Young, Vivian V. Simpson, Joseph B. Simpson, Jr.,* and *Simpson & Simpson* on the brief, for the appellant.

Submitted on brief by *James H. Pugh, Sheldon E. Bernstein* and *Newmyer & Bress* for the appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal from a determination by the Circuit Court for Montgomery County that a divorce *a vinculo matrimonii* obtained in Nevada by the appellant, Sarah P. Colby (the wife), was null and void, and that the appellee, Benjamin Colby (the husband), was entitled to a Maryland divorce *a mensa et thoro*.

Benjamin and Sarah Colby were married in Chicago in 1927, had three children, and lived together in Chevy Chase for over four years prior to March 4, 1955. On the latter date, the wife, without prior notice to her husband, took their fifteen year old daughter and went to the home of the wife's mother in Glencoe, Illinois, and immediately thereafter, went to Las Vegas, Nevada. The husband hired a detective in Washington, D. C., to go to Las Vegas and report on his wife's activities. The wife had been regularly corresponding with one Scott B. Appleby, and she had discussed with his Washington attorney her plans for a trip to Nevada. Immediately upon her arrival in Las Vegas, she consulted an attorney, with whom arrangements had previously been made by Appleby's attorney. On March 20, the husband went to Las Vegas to see his wife, returned to Montgomery County, but went back to Las Vegas in April to consult a lawyer who was to inform him if a divorce proceeding was filed. In the meantime the wife made a return train reservation for April 25th but subsequently cancelled it, and on April 19, 1955, exactly six weeks after her arrival, she filed suit for a divorce in Nevada on the ground of extreme mental cruelty. She made plans to return to Washington after the divorce proceedings by making a reservation at a Washington hotel. On June 9, the husband was served in Washington with

Nevada process, and twenty-one days later, the Nevada court granted a decree of divorce.

On July 12, the wife went to Glencoe, and two weeks later wrote to her husband requesting him to put the title to their home in her name, so that she could stay there. In August, she returned to Washington and rented a house on Utah Avenue. On September 21, the husband filed his bill for a partial divorce on the ground of abandonment. The wife, when served with process, answered that the decree of the Nevada court had already divorced the parties. In October of 1955, she returned to Las Vegas and rented another apartment there, but still kept her Utah Avenue house in Washington. In December, she went back to her mother's home in Illinois and then returned to Washington. In January of 1956, she again reversed her route by going to Illinois and then to Las Vegas. Finally, on February 21, 1956, she married Appleby in Las Vegas. In 1957, the chancellor in Maryland found that Sarah Colby had not in fact been divorced, and then awarded a partial divorce to Benjamin Colby.

There is considerable evidence in the record to substantiate the chancellor's conclusion that the wife was not a *bona fide* domiciliary of Nevada. Although she was accustomed to living in a spacious private home in Maryland, she resided in a meager apartment in Nevada and never made an attempt to purchase a home there. Although she had many philanthropic interests in Maryland and Washington, she had none in Nevada. Although most of her relatives and friends lived in the east, none of her relatives or close friends lived west of the Mississippi. Her three children went to eastern schools, and she had no intention of taking them to Nevada for schooling. When she rented an automobile in Nevada, she gave a Maryland address. Her only belongings in Nevada were kept in two suitcases; the rest of her clothing remained in Chevy Chase. She never changed her permanent mailing address to Las Vegas. And she retained her charge accounts in Washington stores and opened no accounts in Nevada.

The primary issue in this case is whether the husband is

estopped from collaterally attacking the decree of the Nevada court. The wife insists that since the husband actually went to Nevada on two different occasions before the Nevada decree was entered, he could have accepted service there and raised at that time any meritorious defenses he may have had. Her argument is that he "flouted" the Nevada court by making certain that he would not be served in that state. In other words, because he had the opportunity to raise the jurisdictional question in Nevada without any hardship to himself, he should be thereafter barred from collaterally attacking the Nevada decree. The husband, on the contrary, contends that the wife's claim of "estoppel" is specious. The novel theory advanced by the wife is without merit.

First, the record clearly shows that, although the husband was in Nevada during March of 1955, and at another time on April 17 or 18, 1955, the divorce suit filed by the wife was not instituted until April 19, 1955, *after* the husband's brief sojourn in Nevada. In other words, from the factual point of view, the husband was not in Nevada when his wife filed suit and therefore did not have the "opportunity" referred to by the wife to defend the action on the jurisdictional question. Of course, he could have remained in Nevada to contest the suit but there is no evidence that he definitely knew when the wife would file suit. Besides he was under no legal compulsion to remain.

Second, it could be argued that the husband had the opportunity to employ a Nevada attorney to contest the divorce. Such an opportunity, however, was not sufficient to bar the husband from subsequently attacking the decree collaterally in this State. The same opportunity was afforded the defendants (Carrie Williams and Thomas Hendrix) in the two Nevada divorce proceedings referred to in the noted *Williams* cases—317 U. S. 287 and 325 U. S. 226. And yet the Supreme Court permitted a collateral attack on the Nevada decrees in the subsequent prosecutions for bigamy of the respective spouses of the defendants in the Nevada proceedings (O. B. Williams and Lillie Shaver Hendrix), who later married in Nevada and returned to North Carolina to reside.

Third, the Supreme Court has expressly delineated the

kinds of situations which will estop an absent defendant from relitigating the jurisdictional issue, and the instant case does not fall within any of the previously stated situations. In *Sherrer v. Sherrer,* 334 U. S. 343 (1948), one of the leading cases, the wife left her husband in Massachusetts and went to Florida with their two children. She obtained employment there, and placed one child in school. She informed her husband that she did not intend to return. After a three months' residence in Florida, she filed suit for a divorce. The husband retained Florida counsel, entered a general appearance, denied that his wife was domiciled in Florida, and appeared personally at the · hearing to testify concerning the custody of the children. At the trial, however, counsel for the husband did not cross-examine the wife on the issue of domicile, nor did he offer any rebutting evidence. The court granted the divorce, and no appeal was taken. The wife remarried two days after the divorce and remained in Florida with the second husband for awhile. They then returned to Massachusetts. The first husband instituted a proceeding in Massachusetts attacking the validity of the Florida decree. The Massachusetts courts, in finding for the first husband, held that the full faith and credit requirements did not preclude him from re-examining the finding of domicile by the Florida court. The Supreme Court reversed, pointing out that the husband had had full opportunity to litigate *all* of the issues when he appeared in the Florida proceeding. The issue, therefore, was essentially one of *res judicata.* The Florida court had jurisdiction to decide the question of its own jurisdiction, and when it did so with all of the parties before it, its determination was entitled to full faith and credit in the Massachusetts courts.

A similar result was reached on the same day in *Coe v. Coe,* 334 U. S. 378 (1948). Here again the defendant in the divorce action appeared but did not raise the jurisdictional question. And here again, the Supreme Court held that the participation of the defendant in the divorce action—he had pleaded to the merits—barred collateral attack on the jurisdiction. The results of the *Sherrer* and *Coe* cases should not have been entirely unexpected. In 1938, the Supreme Court

had held that where the defendant contests the issue of the plaintiff's domicile in a divorce proceeding, *res judicata* will be applicable. *Davis v. Davis,* 305 U. S. 32. And the doctrine of *res judicata* as to jurisdiction has been applied in other fields than that of divorce even where a jurisdictional question was not raised in the initial proceeding. *Stoll v. Gottlieb,* 305 U. S. 165 (1938); *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U. S. 371 (1940); "Res Judicata," 65 Harv. L. Rev. 818, 853 (1952).

The extent of the *Sherrer* and *Coe* cases, *supra,* has not been free from doubt, however. In 1951, the Supreme Court listed in *Cook v. Cook,* 342 U. S. 126, the circumstances in which a relitigation of jurisdiction will not be permitted, when it said:

> "If the defendant spouse appeared in the Florida proceedings and contested the issue of the wife's domicile (*Sherrer v. Sherrer,* 334 U. S. 343) or appeared and admitted her Florida domicile (*Coe v. Coe,* 334 U. S. 378) or was personally served in the divorce state (*Johnson v. Muelberger,* 340 U. S. 581, 587), he would be barred from attacking the decree collaterally; * * * On the other hand, if the defendant spouse had neither appeared nor been served in Florida, the Vermont court, under the ruling in *Williams v. North Carolina,* 325 U. S. 226, could reopen the issue of domicile."

The Supreme Court did point out in the *Cook* case that the decree of the divorce-granting state is entitled to a presumption of validity. However, "[t]hat presumption may of course be overcome by showing, for example, that * * * [the defendant] never was served in Florida nor made an appearance in the case either generally or specially to contest the jurisdictional issue." In the case at bar, the husband has rebutted the presumption of validity to which the Nevada finding was entitled by showing that he neither was served in Nevada nor made an appearance of any sort in the proceedings in that State. Since the Supreme Court requires a defendant to have had some contact with the di-

vorce-granting state before the divorce proceeding becomes *res judicata* as to him, it is clear that the requirement laid down by that Court entitling a defendant to relitigate the jurisdictional issue in his own state has been met by the husband in this case.

Some of the states have interpreted the *Sherrer* and *Coe* cases, *supra,* quite narrowly in order to permit a state to regulate the marital status of those whom it considers to be its domiciliaries. New Jersey, for example, permitted collateral attack on a Florida divorce decree by a wife who had, in return for a proper settlement, agreed to confer jurisdiction on a Florida court by entering an appearance through counsel engaged by her husband. *Staedler v. Staedler,* 6 N. J. 380, 78 A. 2d 896 (1951). See also *Brasier v. Brasier,* 200 Okla. 689, 200 P. 2d 427 (1948), [collateral attack allowed where defendant had executed a written entry of appearance, but did not appear in person, filed no pleadings, and was not represented by counsel in divorce action]; *Chirelstein v. Chirelstein,* 8 N. J. Super. 504, 73 A. 2d 628 (1950), *modified on other grounds,* 12 N. J. Super. 468, 79 A. 2d 884 (1951), [collateral attack allowed where defendant filed a perfunctory answer and it was admitted that domicile was fraudulent]; *Davis v. Davis,* 259 Wis. 1, 47 N. W. 2d 338 (1951), [collateral attack allowed where defendant filed a special appearance in divorce proceedings]; *Gromeeko v. Gromeeko,* 110 Cal. · App. 2d 117, 242 P. 2d 41 (1952), [collateral attack allowed where power of attorney obtained from defendant was acquired by fraud and duress]; *Eaton v. Eaton,* 227 La. 992, 81 So. 2d 371 (1955), [collateral attack allowed where defendant signed waiver of summons and entry of appearance in divorce action, but papers were never filed]; and *Zenker v. Zenker,* 161 Neb. 200, 72 N. W. 2d 809 (1955), [collateral attack allowed where there was fraudulent service of process on defendant]. Although it is difficult to reconcile all of these decisions with the *Sherrer* and *Coe* cases, *supra,* they at least support what the Supreme Court of Nebraska stated in *Zenker v. Zenker, supra:*

"[The Supreme Court decisions] each cover a

very narrow situation, and * * * they will not be applied to situations other than those which they specifically decide."

The instant case does not call for an application of the doctrine of *res judicata,* or require the Nevada decree to be given full faith and credit. Since it is clear that the husband in this case never participated to the slightest extent in the Nevada proceeding he was not barred from relitigating the jurisdictional question in a collateral proceeding in this State. It follows that the partial divorce granted by the Circuit Court for Montgomery County should be affirmed.

*Decree affirmed, the appellee to pay the costs.*