NAYLOR *v.* NAYLOR

[No. 245, September Term, 1957.]

616

618

*Decided July 3, 1958.*

*Motion for rehearing filed August 1, 1958, denied September 16, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT and HORNEY, JJ.

*John F. King,* with whom were *G. C. A. Anderson* and *Anderson, Barnes, Coe & Morrow* on the brief, for the appellant.

*Everett L. Buckmaster* and *George L. Clarke,* with whom

were *Buckmaster, White, Mindel & Clarke* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

Lawrence P. Naylor, III (the husband) and Frances King Warfield Naylor (the wife) were married in Maryland in 1946, had five children, and lived together until shortly before the commencement of the litigation which is the subject of this appeal.

The marriage became unharmonious and in the summer of 1956, the parties decided to separate and executed an agreement concerning their property rights, custody of the children, and support payments. The agreement was expressly conditioned on the wife's obtaining a divorce. In a letter from her attorney to the husband's attorney on November 9, 1956, it appears that the husband was willing to finance a round-trip ticket for his wife to Reno, Nevada, and that the support payments would begin immediately upon her return. The wife flew to Reno with their infant son on November 11, 1956, planning to return by Christmas when the Nevada six weeks residence requirement would have been met. She returned on Christmas Day, but without having filed a suit for divorce. She spoke to her husband briefly about the fact that she did not like the custody provisions of the separation agreement, and on the very same day she surreptitiously took the other four children and returned with them by plane to Nevada. The husband did not discover the taking of the children until the following day.

Back in Nevada, the wife filed suit for divorce and custody of the children, alleging that she "now and has been for more than six weeks preceding the filing of the complaint herein, a *bona fide* resident of and . domiciled in the County of Washoe, State of Nevada, and has been physically and corporeally present in said State each and every day for said period of time * * *." She also alleged that the separation agreement with her husband was unfair, unjust, and had been entered into under duress. The husband was personally served with process in Baltimore on January 3, 1957, but he never appeared in the Nevada proceeding.

In the meantime, the husband, who was upset by the removal of all of the children to Nevada, had spoken to several persons in Howard County where he and his wife had formerly lived together, and became convinced, as a result of those conversations, that his wife had committed adultery. Consequently, on January 2, 1957, the day before he was served with Nevada process, the husband filed suit in the Circuit Court for Howard County for a divorce *a vinculo matrimonii* and for the custody of the children. The wife, who was personally served with Maryland process on January 11, 1957, in Nevada, was thereby warned to show cause why the divorce and custody decree should not be granted.

On January 24, 1957, the Nevada court awarded the wife an absolute divorce and the custody of the five children, and on February 25, 1957, it passed a final decree. The court, in its "Findings of Facts," declared (i) that the wife had been a *bona fide* domiciliary in Nevada for six weeks before the suit was filed and intended to make Nevada her "residence and domicile for an indefinite period of time," (ii) that the 1956 property and custody agreement was invalid, and (iii) that the husband had had ample opportunity to defend the Nevada action but instead merely appointed investigators.

On February 23, 1957, the wife filed a "Motion for Special Appearance" in the husband's suit "for the purpose of attacking the jurisdiction of the Maryland court * * *." The motion alleged that the wife and the five children were *bona fide* domiciled in Nevada. A hearing on the jurisdictional question was held on March 20, 1957. The wife's counsel steadfastly maintained that his appearance for her was only "for the purpose of this motion." The husband testified that his wife's sole purpose in going to Nevada was to procure a divorce. A copy of the letter of November 9, 1956, with respect to the round-trip ticket to Reno and the commencement of the support payments after the wife's return, was produced. Venita P. Herman, the wife of a detective, testified that she had stayed for five days in the same tourist ranch in which the wife and children were living. The wife's cabin had four rooms, but no kitchen, and since the children were not permitted to eat in the main dining room, they had to eat with

the servants away from their mother. There was also testimony that the children were not going to school and that one of them expected to return to Maryland to live. A bodyguard also lived in the same cabin with the wife to prevent service of process. There was also some evidence of a telephone conversation, the gist of which was that the mother and sister of the wife planned to pick up the wife and children and return with them to Maryland. At the hearing on the merits, the paramour of the wife, Rigan McKinney, testified that it was the intention of the wife to remain in Nevada, and that it was his intention to remain in Howard County. But shortly thereafter he joined her in Nevada, married her, and is residing there with her.

On April 18, 1957, the chancellor overruled the wife's "Motion and Special Appearance" and ordered her to file an answer to her husband's bill for divorce within twenty days. The chancellor based his action on the fact that the evidence demonstrated the wife's lack of a *bona fide* domicile in Nevada. The chancellor was also of the opinion that since Maryland Rule 124 c "abolished" special appearances, the wife was before the court generally. At this point the wife employed new counsel, who promptly requested, and were granted, on May 8, 1957, an extension of time in which to file an answer, and then reiterated that they were appearing only specially. On May 14, 1957, counsel filed a special appearance for the purpose of appealing the order of April 18, and on the same day entered an appeal to this Court. By a divided court, we dismissed the appeal as premature and declined to rule on the validity of the chancellor's construction of Rule 124 c. See *Naylor v. Naylor,* Md., 133 A. 2d 74 (1957).[1] On the return of the mandate, the chancellor again passed an order, on July 2, 1957, requiring the wife to answer. Her counsel, in another effort to prevent the chancellor from exercising *in personam* jurisdiction over the wife, again "appearing specially for the sole purpose of contesting the jurisdiction," filed in this Court a motion for a writ of prohibition

---

1. The action of this Court on the first appeal was not reported in the Maryland Reports.

directed to the lower court. This motion was denied on July 24, 1957.

The husband obtained a decree *pro confesso* against the wife on July 24, 1957, and on August 1, a hearing on the merits was held. In order to avoid any action that might be construed as a general appearance, counsel for the wife neither filed pleadings to the merits nor appeared at the hearing. The husband produced evidence of his wife's adultery and of his fitness for the custody of the children. The chancellor held the case *sub curia* until December 2, 1957, when he stated that the testimony "would justify the granting of a divorce *a vinculo matrimonii* to the husband and an award of the custody and guardianship of the children to him," but, despite his previous decision on the question of jurisdiction, he found as a fact that the domicile of the wife in Nevada was *bona fide* and that Maryland was compelled to give full faith and credit to the Nevada decree. "Reluctantly," he dismissed the bill of complaint, from which action the husband appealed to this Court.

The wife's counsel then filed a "Motion to Correct Opinion of Court"—again "appearing specially for the purpose of this motion only, and not generally"—in order to clarify the circumstances of the chancellor's order of May 8, 1957, which had extended "without prejudice" the wife's time to answer. This motion was denied on December 23, 1957, with the accompanying remark that the words "without prejudice" in the order meant what they said.

On the question of a divorce *a vinculo matrimonii,* it is well settled that the validity of the decree of a sister state may be impeached by proving that the court granting the decree lacked jurisdiction because the spouse who obtained the divorce had never acquired a *bona fide* domicile in the divorce-granting state. See *Brewster v. Brewster,* 207 Md. 193, 199, 114 A. 2d 53 (1955), and cases therein cited. Usually the colorable nature of the claim of domicile is revealed by an immediate return to the state of original domicile as soon as the decree is signed. In the instant case, however, contrary to the customary procedure, the wife has remained in Nevada for over two years. The argument, therefore, is that her

lengthened stay in Nevada is sufficient indication of an intention to make that state her permanent domicile. If, however, her ultimate intention is to return to Maryland, the two-year stay may have been only a temporary sojourn, falling short of a *bona fide* domicile in Nevada. This is so because the extended stay in Nevada is only one factor to be considered in determining the real intention of the wife in this case. There are other important factors.

An examination of the relatively few cases in recent years which have sustained the *bona fide* character of the domicile in another state reveals that one or all of several other factors were present, such as: (i) residence in the divorce-granting state for a substantial period before the divorce action was instituted; (ii) the removal of all or substantially all of one's personal property to the new residence; (iii) the severance of all or most of one's connections in the state departed from; (iv) the engagement in permanent business activities or gainful employment; and (v) the purchase or renting of a permanent home or other substantial place of abode.[2]

None of the factors herein referred to, except a prolonged stay in Nevada, is present in the case now before us. The wife was staying in a tourist ranch; she had not sent the

2. See, for example: *Lebensfeld v. Lebensfeld,* 157 N. Y. S. 2d 678 (1956), [residence exceeded legal requirement; rented substantial apartment; placed children in school]; *DeLuca v. DeLuca,* 284 App. Div. 987, 135 N. Y. S. 2d 438 (1954), [spouse who obtained divorce had extended residence in domicile before marriage]; *Brown v. Brown,* 28 N. J. Super. 165, 100 A. 2d 315 (1953), [removal of belongings; re-registered automobile; opened bank account; installed telephone; sought business investment; never returned to original domicile]; *Proper v. Proper,* 102 Cal. App. 2d 612, 228 P. 2d 62 (1951), [planned to engage in business activity in new residence before leaving original domicile]; *Peff v. Peff,* 2 N. J. 513, 67 A. 2d 161 (1949), [severance of personal affairs before moving; purchased home for self and children; engaged in numerous business activities]; *Ische v. Ische,* 252 Wis. 250, 31 N. W. 2d 607 (1948), [secured permanent employment; planned to engage in business with a partner; bought a ranch site]; and *Heard v. Heard,* 323 Mass. 357, 82 N. E. 2d 219 (1946), [purchased home for self and children prior to divorce]. Cf. *Epstein v. Epstein,* 193 Md. 164, 66 A. 2d 381 (1949).

children to school; she had not bothered to wind up her personal affairs in Maryland; one of the children fully expected to return to this State to live; and her mother and sister had planned to pick her and the children up and bring them back to Maryland. In short, the wife did few of the many things she would certainly have done had she really contemplated removing from this State to Nevada and residing there permanently. We think it is clear that what she did was not sufficient to show that her continued stay in Nevada was permanent in nature. See *Colby v. Colby,* 217 Md. 35, 141 A. 2d 506 (1958). Furthermore, there is no evidence that the paramour, to whom the wife is now married, had any previous connection with Nevada or has any present intention of remaining there permanently.

As stated, the chancellor first decided that the wife lacked a *bona fide* domicile in Nevada, but after hearing the case on its merits, and holding it *sub curia* for a substantial period of time, he changed his mind, and concluded that the domicile of the wife in Nevada was *bona fide*. In so doing, he cited *Vanderbilt v. Vanderbilt,* 354 U. S. 416, decided June 24, 1957. However, the Supreme Court in that case merely decided that the valid Nevada decree of the husband did not extinguish the right of the wife to obtain a support decree in New York. It had no relevance to the issue in the instant case.

On the question of the custody of the children, the courts and law writers are by no means in accord. The Nevada court granted custody of the five children to the mother. Presumably, the children also still reside in Nevada with the mother, as they did at the time of the passage of the order appealed from in this case. Since both parents are domiciled in Maryland, and since there is no evidence that any of the children have a domicile other than that of their parents, the children are still domiciled in this State. This situation poses several controversial questions: (i) Did Nevada have jurisdiction to grant custody to the mother? (ii) If so, does Maryland have to give full faith and credit to the Nevada custody decree? (iii) If not, does Maryland have jurisdiction to determine the custody of the children? and (iv) If

Maryland does have jurisdiction, would it be appropriate to exercise that jurisdiction?

The traditional rule is that domicile is sufficient to give jurisdiction to the awarding court in a custody case. In 2 *Beale, Conflict of Laws*, § 144.3 (1935), Professor Beale states:

> "* * * [J]urisdiction to give a child to one parent or the other depends in principle on the domicil of the child; and a state which is the temporary residence of the child, not the domicil, cannot confer the right to custody."

See also *Beale, "The Status of the Child and the Conflict of Laws*," 1 Chi. L. Rev. 13 (1933). In *"Custody of Children in Divorce Suits*," 7 Corn. L. Q. 1 (1921), Professor, now Judge, Goodrich, had this to say:

> "It would seem, though it is not an open and shut proposition, that the award of the custody of children in a divorce suit is an adjudication affecting status and so properly made only where the child is domiciled. * * * That the basis of an effective custody decree is domicile seems fairly well established by authorities. Thus, it has been held that the decree should not be made when the domicile is elsewhere. Decrees for custody of children made when the children's domicile was not in the state when the decree was rendered have been denied recognition. Where the child is domiciled in the state where the cause is pending, the jurisdiction of the court is not defeated because the children are not in court, whether their removal was to frustrate the effect of a decree or any other purpose."

Subsequently Professor Goodrich stated flatly that: "Jurisdiction to award custody of children in a divorce action is in the courts at the domicile of the children." *Conflict of Laws*, Sec. 136 (3d ed.). Another leading law writer contends that in the United States "jurisdiction to determine the custody of children is primarily located at the domicil of the child."

1 *Rabel, Conflict of Laws* 532 (1945). The *Restatement, Conflict of Laws*, Sec. 117 (1934), also states:

> "[A] state can exercise through its courts jurisdiction to determine the custody of children * * * only if the domicil of the person placed under custody * * * is within the state."

The conventional approach to the jurisdictional problem has been to classify the custodial relationship between parent and child as one of status, and to apply standard status rules. For instance, in a divorce proceeding, a jurisdiction in which but one spouse is domiciled has power to terminate the marital status because such power is needed for the protection of the legitimate interest of that state in the welfare of its citizens. Similarly, it is reasoned that a state should be able to control the custody of children domiciled within it. Thus the traditional view accepts this premise and assumes that a state can validly award custody of children even though personal jurisdiction over them is lacking.[3] However, in recent years a few courts and writers have declined to accept the traditional rule, and have adopted the "presence" theory of jurisdiction in custody cases. The basic premise of this theory is that an inquiry into the child's welfare can best be carried on in the jurisdiction where the child is physically present.[4]

3. The cases most frequently cited include: *Callahan v. Callahan,* 296 Ky. 444, 177 S. W. 2d 565 (1944); *Jones v. McCloud,* 19 Wash. 2d 314, 142 P. 2d 397 (1943); *In re Skinner's Guardianship,* 230 Iowa 1016, 300 N. W. 1 (1941); *Pieretti v. Pieretti,* 13 N. J. Misc. 98, 176 A. 589 (1935); *Elliott v. Elliott,* 181 Ga. 545, 182 S. E. 845 (1935); *State ex rel. Larson v. Larson,* 190 Minn. 489, 252 N. W. 329 (1934); *Person v. Person,* 172 La. 740, 135 So. 225 (1931); *Wear v. Wear,* 130 Kan. 205, 285 P. 606 (1930); *Barnes v. Lee,* 128 Ore. 655, 275 P. 661 (1929); and *Duryea v. Duryea,* 46 Idaho 512, 269 P. 987 (1928). Annotation, 9 A. L. R. 2d 434 (1950). In many of these cases the *residence* of the child was also his *domicile;* hence, it was not always necessary to find domicile as the only proper jurisdictional base.

4. See *Stumberg, Conflict of Laws* (2d ed. 1951), 327; *May v. Anderson,* 345 U. S. 528 (1953); *Finlay v. Finlay,* 240 N. Y. 429, 148 N. E. 624 (1925) (Cardozo, J.); *Wicks v. Cox,* 146 Tex. 489, 208 S. W. 2d 876 (1948); *Rogers v. Commonwealth,* 176 Va. 355, 11 S.

It has also been suggested that several states could have con-current jurisdiction. See *Stansbury, "Custody and Mainte-nance Law Across State Lines,"* 10 *Law and Contemp. Prob.* 819 (1944).[5] However, there is at least one objection to each of the last two theories. Under the "presence" theory, a premium is put on removing children from the domiciliary state unless that state can bind the spouse who takes the children without having personal jurisdiction. In such a situation, possession would be not merely nine points of the law; it would be all ten points. See Note, 53 Harv. L. Rev. 1024 (1940). And, the difficulty with permitting several states to take "concurrent jurisdiction" is that, unless the number of such states was somehow frozen at the very begin-ning of the marital difficulties, it is possible there might still be some forum shopping — the very evil that a domiciliary concept of jurisdiction seeks to avoid.

We have consistently adhered to the "domicile" theory in this State. In *Zouck v. Zouck,* 204 Md. 285, 301, 104 A. 2d 573 (1954), we did remark that the lower court was without jurisdiction to award custody of the child of the parties to the wife, with whom the child had lived, for the reason that the child was neither domiciled *nor present* in this State. But the question of *presence* was left open, and it is not a factor here.

There are, of course, many factors involved in a child cus-tody proceeding, but in a final analysis of the problem, the welfare of the child is unquestionably the most important. For this reason we are of the opinion that the marital domicile

E. 2d 584 (1940); *Durfee v. Durfee,* 293 Mass. 472, 200 N. E. 395 (1936); *Kenner v. Kenner,* 139 Tenn. 211, 201 S. W. 779 (1918); *Anderson v. Anderson,* 74 W. Va. 124, 81 S. E. 706 (1914); and *De la Montanya v. De la Montanya,* 112 Cal. 101, 44 P. 345 (1896). See also cases cited in Ehrenzweig's article in 51 Mich. L. Rev. 345 (1953), subtitled *"Law and Reason v. The Restatement."*

5. See *In re Wilmot's Guardianship,* 74 Ariz. 344, 248 P. 2d 995 (1952); *Lynn v. Wright,* 252 Ala. 606, 42 So. 2d 490 (1949); *Samp-sell v. Superior Court,* 32 Cal. 2d 763, 778, 197 P. 2d 739, 749 (1948); *Stafford v. Stafford,* 287 Ky. 804, 155 S. W. 2d 220 (1941); *White v. Shalit,* 136 Me. 65, 1 A. 2d 765 (1938); and *Goldsmith v. Salkey,* 131 Tex. 139, 112 S. W. 2d 165 (1938).

—if it be available—is the best forum in which to decide the question of custody. In the marital domicile, where most of the relatives, friends and neighbors reside, it is easier to obtain the best evidence of what is in fact to the best interests of the child.[6] Since Maryland has been the marital domicile of the parties to this suit for many years, the courts of this State are peculiarly equipped to obtain the evidence necessary for a determination of what would be in the best interests of the children, and particularly a determination of who shall be charged with their support and maintenance as well as visitation rights and other duties and privileges of the parents toward the children. The fact that the children are not present in Maryland and that the husband may have to go to Nevada to reclaim them is not a barrier to the jurisdiction of the chancellor to award custody to the father. And we see no reason to delay that action. Indeed, in those states —such as Maryland—which have adopted domicile as the jurisdictional basis of custody decrees, the courts almost always assume jurisdiction although the children may be temporarily in another state.

We have already held that Nevada lacked jurisdiction to grant the wife a divorce because she had never acquired a *bona fide* domicile in that state. The next question is whether Nevada had jurisdiction to award custody of the children. We think not. Since the wife and mother *is* domiciled in Maryland, there is no doubt that the children *are also still* domiciled in this State as is the husband and father. In *Wilson v. Wilson*, 66 Nev. 405, 212 P. 2d 1066 (1949), the Supreme Court of Nevada, after stating that the "matter of

---

6. See *Gessler v. Gessler*, 78 So. 2d 722 (Fla. 1955), in which a Florida court refused to take jurisdiction in a custody proceeding because it concluded that Pennsylvania was the best place to litigate the question since all of the parties had lived there for many years, and "it * * * [was] the most practical [place] to litigate the question." See also the discussion in *Casteel v. Casteel*, 45 N. J. Super. 338, 132 A. 2d 529 (1957), and *Sampsell v. Superior Court*, 32 Cal. 2d 763, 197 P. 2d 739 (1948). Cf. *Haney v. Knight*, 197 Md. 212, 219, 78 A. 2d 643 (1951), where Maryland refused to decide a custody question, since all of the interested parties were in Virginia.

jurisdiction of the trial court to award custody of the minor child presents a very serious question, which has never been passed upon by this court," held that where the trial court had jurisdiction of *both* parents, it also had jurisdiction to award custody of the minor child, although the child was not present in the state and had never been there. The emphasis in the opinion was on the association of the custody question with that of the divorce and of the domicile of the parents. The law there seems to be that a valid domicile of the wife and mother would in turn give domicile to her children present with her in that state, and this was the basis for the jurisdiction of the Nevada court to award custody of the children to the wife and mother. But since we find that the wife and mother did not acquire a *bona fide* domicile in Nevada, and that the Nevada court was therefore without jurisdiction to grant a divorce, it is equally clear that that court was likewise without jurisdiction to award custody of the children based on the same invalid domicile. Under such circumstances Maryland is not required to give full faith and credit to the custody decree, and we decline to recognize it.

Furthermore, even if we assume that the Nevada court had jurisdiction to award custody of the children to the wife and mother, there is still not the slightest doubt that this State is not now required to give full faith and credit to the Nevada custody decree for several reasons. We think the wife's conduct amounted to fraud practised on the Nevada court. When that court passed the divorce and custody decree, it obviously did not know that the wife had committed adultery with the paramour to whom she is now married, that the paramour had supplied her with funds on which to live during the period she resided in Nevada prior to the decree, and that the wife had surreptitiously removed all of the children, except the infant son, from Maryland to Nevada when she became dissatisfied with the custody provisions of the separation agreement, and which she subsequently asserted in the Nevada proceeding was entered into under duress. With regard to the wife and paramour now living together as man and wife, this Court has held, under similar circumstances, that a wife may forfeit custody of the children. In *Stimis v.*

*Stimis,* 186 Md. 489, 47 A. 2d 497 (1946), the wife's custody of the child was subsequently taken away when she began living with the paramour. See also *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908 (1958), where the *Stimis* case was cited with approval.

The remark of Professor Beale in the article in 1 U. of Chi. L. Rev. 13, at p. 24, is pertinent:

> "When the custody of a child has been awarded to one parent by a court having jurisdiction so to do, the right of this parent will be recognized by other states. The facts upon which the award was based have become *res judicata,* and cannot be reexamined in the second state. But this estoppel extends only to conditions which existed at the time of the original decree; the second court may examine any facts which have occurred since the original decree which throw light upon the fitness of the parents to have custody of the child."

See also *Restatement, Conflict of Laws,* Sec. 147 (1934), and *Barnes v. Lee,* 128 Ore. 655, 275 P. 661 (1929) ; *Woodland v. Woodland,* 153 Ga. 202, 111 S. E. 673 (1922) ; *Griffin v. Griffin,* 95 Ore. 78, 187 P. 598 (1920) ; *Groves v. Barto,* 109 Wash. 112, 186 P. 300 (1919) ; *Wilson v. Elliott,* 96 Tex. 472, 73 S. W. 946 (1903) ; *Kentzler v. Kentzler,* 3 Wash. 166, 28 P. 370 (1891). In *New York ex rel. Halvey v. Halvey,* 330 U. S. 610 (1957), the Supreme Court upheld the power of a court of one state to modify the custody decree of another state if there had been a change in circumstances after the original decree. As was said in *Kovacs v. Brewer,* 356 U. S. 604 (1958) at p. 607:

> "Whatever effect the Full Faith and Credit Clause may have with respect to custody decrees, it is clear, as the Court stated in *Halvey,* 'that the State of the forum has at least as much leeway to disregard the judgment, to qualify it, or to depart from it as does the State where it is rendered.' "

The import of both the *Halvey* and *Kovacs* cases is that

Maryland only has to give to the Nevada decree as much credit as the latter state would have given to one of its own custody decrees. In Nevada, as in Maryland, the courts have power to decree the custody of minor children and may modify or vacate such decree at any time. Nevada statutes of 1953, Ch. 114. See also *Abell v. District Court,* 58 Nev. 89, 71 P. 2d 111 (1937); *State ex rel. Jones v. District Court,* 59 Nev. 460, 96 P. 2d 1096 (1939); *State ex rel. Groves v. District Court,* 61 Nev. 269, 125 P. 2d 723 (1942).

From what has been said we think it is clear that, in the light of the circumstances hereinbefore referred to, a Maryland court is no more bound to adhere and give effect to the original Nevada custody decree than a Nevada court would be; and we therefore hold that the proper Maryland court may now make an award of custody. It follows that the chancellor has jurisdiction to award the care, custody and guardianship of the children, and to determine the other matters relating thereto by considering (i) the best interests of the children, and (ii) the relative fitness of the respective parents, or either of them, to have custody.

For the reasons assigned we think the chancellor was clearly wrong when he found as a fact that the wife had a *bona fide* domicile in Nevada. Furthermore, since he found that the testimony justified the granting of an absolute divorce to the husband, he should have passed a decree to that effect. The chancellor also found that the testimony justified an award of the "custody and guardianship" of the children to the father, but in this respect the evidence appears to be insufficient. It is therefore desirable to take additional testimony as to the care, custody and guardianship of the children. Since the order of the chancellor dismissing the bill of complaint must be reversed, we shall remand the case for the passage of a decree granting the husband a divorce *a vinculo matrimonii,* and for the further purpose of taking such additional testimony—after the passage of a show cause order on both parties pursuant to the provisions of Maryland Rule 324 to be served pursuant to the applicable provisions of Rule 306—as the chancellor shall deem necessary to enable him in the light of existing circumstances to award cus-

tody of the children, and to determine the other matters relating to them in accordance with the views expressed in this opinion.

Since we have decided that the lower court has jurisdiction to award the husband an absolute divorce and to award the care, custody, and guardianship of the children, the question of a "special" or general appearance of the wife is no longer important, and it is not necessary for us to discuss the question further.

> *Order reversed, and case remanded for the passage of a decree of divorce, and for further proceedings with respect to the custody of the children in accordance with this opinion, the appellant to pay the costs.*