## In re LELAH–PUC–KA–CHEE.

(District Court, N. D. Iowa, Cedar Rapids Division. December 29, 1899.)

1. INDIANS—SAC AND FOX TRIBE IN IOWA—JURISDICTION OF STATE COURTS OVER.

In view of the cession by the legislature of Iowa to the United States of jurisdiction over the reservation in Tama county occupied by a portion of the Sac and Fox tribe of Indians, and the acceptance of such cession by congress in the general Indian appropriation act of June 10, 1896 (29 Stat.

331), a district court of the state of Iowa has no jurisdiction to appoint a guardian for the person of a minor of such tribe residing on the reservation.

**2. SAME—GOVERNMENT SCHOOL—COMPULSORY ATTENDANCE.**
. Act March 2, 1895 (28 Stat. 906), prohibiting any Indian agent or other employé of the government from using compulsory means, such as withholding rations or the like, to induce the parents or next of kin of any Indian child to consent to the removal of such child beyond the limits of the reservation, is applicable to the Sac and Fox tribe of Indians in Iowa, and is paramount to any regulation of the department. Under such statute the agent of the tribe and the superintendent of the school established therefor not only have no power to compel children to attend the school, which is situated outside the reservation, by force, but the consent of the parents or next of kin of such children is required to authorize their removal thereto.

**3. SAME—ATTENDANCE AT SCHOOL OF MINORS—EFFECT OF MARRIAGE.**
The fact that an Indian girl, a minor, while in attendance at a government school which is outside the reservation of the tribe of which she is a member, contracts a marriage, in accordance with the custom of her tribe, with another member, does not entitle her husband to a writ of habeas corpus to remove her from the school, nor can she be retained there against her own will; but in such case her marriage releases her from parental authority, and she has the right to remain or not at her own election. So long as she remains unmarried, her attendance during her minority is subject entirely to the will of her parents, or those who stand to her in the parental relation.

This was a hearing on a petition for a writ of habeas corpus on behalf of Lelah-puc-ka-chee, alleged to be unlawfully restrained of her liberty at an Indian school, and the answers of G. W. Malin, Indian agent, and G. W. Nellis, school superintendent.

J. W. Lamb, for petitioner.

H. G. McMillan, U. S. Dist. Atty., and De Witt C. Cram, Asst. U. S. Atty., for respondents.

SHIRAS, District Judge. In this proceeding a petition has been filed praying the issuance of a writ of habeas corpus to cause to be brought before the court Lelah-puc-ka-chee, an Indian girl belonging to the Sac and Fox tribe of Indians, who occupy a reservation in Tama county, Iowa; it being averred in the petition that she is unlawfully restrained of her liberty by being compulsorily kept at the Indian training school, which is situated near the city of Toledo, Tama county, and in the vicinity of the Indian reservation. As it was apparent to the court that in the hearing of the matter questions of moment would arise, which ought not to be determined without opportunity being given for full consideration, and as it was also apparent that need did not exist for taking the Indian girl from the school during the pendency of the proceedings, the court directed the petition for the writ to be set down for hearing, and notice thereof to be given to W. G. Malin, the Indian agent, and G. N. Nellis, the superintendent of the school, who are the parties charged in the petition with illegally and wrongfully depriving the Indian girl of her liberty. Upon the day thus set for hearing the matter, the respondents appeared in person and by the United States district attorney, and filed an answer to the petition, and thereupon counsel for the respective parties were heard at length upon the

questions involved. Briefly stated, the position taken by the attorney for the petitioner is that Lelah-puc-ka-chee is about 18 years of age; that she is a married woman, being the wife of Ta-ta-pi-cha; that, contrary to her wishes and those of her husband, she is compelled to remain at the training school; that there is no law authorizing the Indian agent and school superintendent to compel the attendance of the Indian children of this tribe at the school in question; and that the detention of the girl is therefore wholly unwarranted. On behalf of the respondents it is claimed that Lelah-puc-ka-chee is but little over 16 years of age; that W. G. Malin, the Indian agent, was appointed the guardian of Lelah-puc-ka-chee by the district court of Iowa for the county of Tama, her parents being incapable of taking care of her; that she was placed in the training school, under charge of the respondent Nellis; that in some way she was induced by Ta-ta-pi-cha and other Indians to leave the school, and by intimidation was induced to report that she had been married to Ta-ta-pi-cha; that this pretended marriage is in fact a fraud; that it is necessary, in order to complete her education, that Lelah-puc-ka-chee should be kept for some time yet at the training school, where she was placed by her guardian; that Ta-ta-pi-cha, the alleged husband, with other Indians, is opposed to the education of the Indian children at the training school; and that the present proceeding is merely in aid of this purpose, and, if sustained, will result in defeating the beneficial object for which the school has been established.

The first matter for determination is the position or relation which the Indians settled upon the reservation in Tama county hold with reference to the state and federal governments. It appears that under date of October 11, 1842, the United States entered into a treaty with the Sac and Fox Indians whereby the latter ceded to the United States all their lands west of the Mississippi river, the United States agreeing to assign to them, as a reservation and a permanent place of residence, a tract of land upon the Missouri river, or some of its tributaries, to which the Indians were to remove within three years; the government to pay to the Indians an annual interest of 5 per cent. upon the sum of $800,000, and to pay the existing debts of the Indians, and also to furnish certain supplies. 7 Stat. 596. It further appears that in accordance with the terms of this treaty a reservation was set apart for the Indians, which is now included within the boundaries of the state of Kansas, and the tribes removed thereto. Subsequently a few of the number returned to Iowa, and, uniting with some scattered remnants that had not gone to the new reservation, they established themselves in Tama and the adjoining counties. The government of the United States endeavored to induce these members to join the confederated tribes, and for years refused to pay them any portion of the tribal annuity, but these efforts were of no avail. Finally, in 1856, the state of Iowa, by an act of the general assembly, recognized their right to remain in the state; and in 1857 the Indians bought an 80-acre tract of land in Tama county, making it the nucleus of their proposed permanent settlement, which has increased, through

the bounty of the state and national governments, until it now includes nearly 3,000 acres in extent, with an Indian population of about 400 souls. In 1895 there was organized what is known as "The Indian Rights Association of Iowa," the main purpose of which was to labor for the advancement of the Indians on the Tama reservation; and to that end the general assembly of Iowa was induced to pass in 1896 an act ceding to the United States jurisdiction over the reservation in question, which cession was accepted by congress by a clause inserted in the act approved June 10, 1896, making appropriations for the Indian department, in which clause it is enacted "that the United States hereby accepts and assumes jurisdiction over the Sac and Fox Indians of Tama county, in the state of Iowa, and of their lands in said state, as tendered by the act of the legislature of said state.  *  *  *"  29 Stat. 331. Through the combined efforts of the agent for the reservation, the Indian Rights Association, and the department for Indian affairs, there was secured from congress, under date of June 10, 1896, an appropriation of the sum of $35,000 for the purchase of a site and the erection of the necessary buildings for an industrial school at or near the reservation in Tama county; and the money thus appropriated was used in the construction of the buildings now constituting the Indian training school, which adjoins the town of Toledo, and is some four or five miles from the reservation.  From this brief statement it sufficiently appears that the reservation in Tama county and the Indians living thereon are now committed to the care and control of the United States government, and the source of the authority of the Indian agent and superintendent of the school over the Indians must be sought in the legislation of congress, and the regulations of the department in charge of Indian affairs.  I can find no substantial ground upon which to base the right and authority of the district court of Iowa for Tama county to appoint guardians for the persons of the Indian children living on the reservation.  If this right exists simply by reason of the fact that the Indians reside within the territorial boundaries of Tama county, it would necessarily follow that the state court would possess the right to appoint administrators of the estates of the Indians, and in all respects to take charge of the domestic relations of these Indians; but this right has never been asserted, and it is apparent that the exercise thereof would of necessity cause constant confusion in the affairs of the Indians.  As I understand it, the purpose of the cession by the state to the national government of the jurisdiction over the reservation and the Indians living thereon was to center in the one government the duty of taking charge of these Indians, and thereby to avoid the evils that would necessarily arise from a divided control over them.  If it should be held that the state court has the power and right to appoint guardians over the persons of the Indian children, on the allegation made in the case of Lelah-puc-ka-chee, to wit, that her parents are not taking proper care of her, or for any other reason, then that court may select any competent person to act as guardian, and such person could remove the child from the reservation, and would be en-

titled to demand reimbursement for the expense of maintaining and educating the ward from some source; but it is apparent that the state court could not reach, for such purpose, the interest of the child in the tribal property. These and other like considerations result in the conclusion that the right to compel the attendance of the Indian girl at the training school cannot be based upon the fact that the Indian agent was appointed her guardian by the district court of Tama county. In the case of U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228, the supreme court reannounced the doctrine that had been held in the early cases of Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25, and Worcester v. Georgia, 6 Pet. 515, 4 L. Ed. 483, that:

"The Indian tribes are the wards of the nation. They are communities dependent on the United States. Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the states, and receive from them no protection."

It will be noticed that this rule is announced with respect to the Indian tribes, and is not intended to be applied to individuals who may have severed their tribal relations, or who have become incorporated into the citizenship of the state in which they reside, but it is the rule that is applicable to tribes who are in the situation of the Sacs and Foxes on the reservation in Tama county; and therefore it must be held that the appointment of G. W. Malin as guardian of the person of Lelah-puc-ka-chee is of no force or effect, for the reason that she is a member of the Indian tribe, and as such is not within the jurisdiction of the state.

The next question for consideration is whether the Indian agent has the right to compel the attendance of the Indian children at the training school, regardless of the wishes of the parents or of the children themselves. My attention has not been called to any act of congress making attendance upon this school compulsory upon the children of the reservation, or conferring upon the agent the power to take the children from their homes and place them in the school, and to enforce their remaining at the school by measures restrictive of their personal liberty; and I do not understand that this compulsory power is claimed to exist, on behalf of the respondents. In the answer filed to the petition for the issuance of the writ, it is averred that:

"Under the laws of congress, and in accordance with the provisions of the rules and regulations of the commissioner of Indian affairs, it is the duty of the agent of said reservation and the superintendent of the Indian school, in so far as possible, to secure the attendance at said school of all children between the age of five and eighteen years."

And this statement, in my judgment, fairly defines the power vested in the respondents as Indian agent and superintendent of the Indian school.

But the duty to secure the attendance of the children at the school does not include the power to compel their attendance by force, contrary to the wishes of their parents. Certainly the right to supersede and override parental control in such matters cannot be based on anything less than congressional action to that end,

98 F.—28

even if that would be effectual unless it was concurred in by the Indians acting in their tribal capacity.

In the Indian appropriation act approved March 3, 1893, it was enacted that:

"The secretary of the interior may in his discretion establish such regulations as will prevent the issuing of rations or the furnishing of subsistence either in money or in kind to the head of any Indian family on account of any Indian child or children between the ages of eight and twenty-one years who shall not have attended school during the preceding year in accordance with such regulations. * * * Hereafter the secretary of the. interior may, in his discretion, withhold rations, clothing and other annuities from Indian parents or guardians who refuse or neglect to send and keep their children of proper school age in some school a reasonable portion of each year." 27 Stat. 612.

In the act approved March 2, 1895 it is provided that:

"Hereafter no Indian child shall be sent from any Indian reservation to a school beyond the state or territory in which said reservation is situated without the voluntary consent of the father or mother of such child, if either of them are living, and if neither are living without the voluntary consent of the next of kin of such child. * * * And it shall be unlawful for any Indian agent or other employee of the government to induce, or seek to induce, by withholding rations or by other improper means, the parents or next of kin of any Indian to consent to the removal of any Indian child beyond the limits of any reservation." 28 Stat. 906.

Under the provisions of this section of the act of 1895, Indian agents and school superintendents are clearly prohibited from using compulsory means, such as the withholding of rations, payment of annuities, or the like, in order to coerce the parents or next of kin of any Indian child into permitting the removal of the child beyond the reservation; and this congressional enactment necessarily abrogates and nullifies all rules and regulations of the department of the interior, or any of its bureaus, which conflict therewith. As the Indian training school in Tama county is beyond the limits of the reservation, the statute just cited is applicable thereto; and under its provisions the agent in charge thereof is forbidden from coercing the parents of the children, by withholding rations, annuities, or the like, into giving consent to the removal of their children beyond the limits of the reservation, in order that they may be placed in the training school. Not only does it appear that congress has not conferred upon the Indian agents and school superintendents the power to take the Indian children by force and remove them to schools situated beyond the reservation, without the consent of their parents or next of kin, but, on the contrary, the consent of the parents is made a condition to such removal, as well as in cases wherein it is proposed to place Indian children in white families. I can see no other conclusion from the statute applicable to the situation than that in this case. The Indian agent and school superintendent must seek to secure the attendance of the children of the reservation at the training school through the influence of the tribe and of the parents of the children; and, to secure such influence, the good will and confidence of the adults of the tribe must be acquired. This will doubtless require time, and careful and discreet conduct on the part of the officials. If I am correctly informed, much dislike towards the school as a place for the edu-

cation of the Indian children now exists among many of the tribe, due partly to the natural belief among the Indians that the school training is intended to alienate the pupils from their tribe, but also partly due to the overzeal in the past management of the affairs of the agency, and to unwise interference of third parties, which has resulted in mistrust of the motives of those in charge of the reservation, and a consequent antagonism to plans and purposes intended for the actual advancement and betterment of the condition of the Indians. Owing to the inherent nature of the Indians, and to the conflict that has existed between them and the whites since the advent of the latter upon this continent, it must be expected that their suspicions of the motives of the whites will be easily aroused, and cannot be readily allayed. It would seem clear that the success of the training school at Tama City, as now constituted, cannot be assured unless it is so conducted as to win the confidence and good will of the tribe as a whole, or at least of a large portion of the more progressive element; and surely this cannot be accomplished by the use of force or other means whereby the will of the Indian is overcome, leaving his judgment unconvinced. The school and attendance thereat should not be made a matter to be feared, but, on the contrary, the Indians should be led to understand that this school is an institution of their own reservation, and that attendance thereat and success therein will benefit their children as Indians, and that it is not the purpose to wean the children from the tribe, and convert them into mere hangers-on of the whites. The creation of this feeling of confidence in the beneficent purposes of the school cannot be accomplished in a day, but it is the work to which the efforts of the agent and superintendent should be directed, rather than to merely enlarging the compulsory attendance of the children of the reservation. As far as possible, all causes of irritation operating on the feelings of the adult Indian should be removed, and every means possible should be resorted to that will win their confidence, and enlist their co-operation in carrying on the industrial education of their children. In this work the agent and superintendent are entitled to the hearty support of all good citizens, and should not be hampered by ill-judged, though well-meant, interference on the part of outsiders; and, so long as they properly perform the duties of their positions, they are entitled to be protected against unwarranted influence brought to bear upon the Indians themselves. It is the government of the United States that has put into operation the training school at Tama City, and it is one of the agencies upon which the United States depends to advance the condition of the Indians upon the reservation, and to secure the confidence of the Indians in the beneficent purposes of the government towards them; and therefore all efforts, without just cause, to interfere in the conduct of the agency or the Indian school, and thereby to cause ill feeling on part of the Indians towards the government, might bring the actors within the condemnation of section 2113 of the Revised Statutes of the United States, which declares that any one "who alienates or attempts to alienate the confidence of any Indian or Indians from the government of the

United States, is liable to a penalty of one thousand dollars." Any good citizen who deems there is cause for believing that any official connected with the Indian reservation is derelict in his duty can readily call the attention of the Indian department to the matter, and thus secure an investigation of the charge, or, if need exists, may invoke, in a proper case, judicial action, and will be commended for so doing; but if one disregards these methods of securing justice to the Indian, and contents himself with creating hard feeling on part of the Indians against the government officials, he lays himself open to the charge of being an intermeddler without a commendable purpose.

Some discussion on part of counsel has been had over the effect of a marriage which it is claimed has been had, according to the custom of the tribe, between Lelah-puc-ka-chee and Ta-ta-pi-cha; it being claimed on behalf of the respondents that, if such a marriage should be given recognition by the court, it would afford an easy method by which the attendance of the girls at the school could be prevented. If a marriage in accordance with the recognized custom of the tribe has taken place between the parties named, I know of no ground upon which the court would be justified in pronouncing it invalid and of no binding force. The question that lies at the foundation of the proceeding now before the court is whether the Indian girl is in fact unlawfully restrained of her liberty. If she is in attendance at the school voluntarily, or has been placed there by her parents, being under age, I see no good reason why the court should grant a writ of habeas corpus to her husband to compel her to leave the school. The true interests of the girl in such case become of paramount importance. A refusal of the writ under the circumstances is not a denial of the validity of the alleged marriage, but is a recognition of the right of the wife, in view of her youth, to obtain a reasonable education, which will probably better fit her for her duties as a wife, and as a member of the tribe to which she belongs. When this marriage took place the girl was in attendance at the training school, and assuming that she was there with her own consent or that of her parents, and if she wishes to complete her education before leaving the school, I cannot see that the husband has just cause of complaint if the court should refuse to compel the wife to leave the school, and be thus deprived of the benefits she would receive from a continuation thereat.

The conclusion reached upon the questions submitted to the court is that the respondents, as the agent and school superintendent at the Tama county reservation, cannot by force or compulsion take the Indian children from the reservation proper, and keep them at the Indian training school, without the consent of the parents, or those who may stand in that relation to them; that, if Lelah-puc-ka-chee has in fact been married to Ta-ta-pi-cha according to the recognized tribal custom and manner, that fact emancipates her from parental control, and, if she wishes to leave the school, she cannot be lawfully prevented from so doing, but if she, although married, wishes to continue in attendance at the school, she has

the right so to do; that if she is not in fact married to Ta-ta-pi-cha, and her parents desire to have her remain in the school, she being less than 18 years of age, the respondents have the right to require her attendance, but, if her attendance can only be secured by compulsion, that compulsion must be exercised by the parents, and not by the respondents. I trust that the foregoing statement of the views of the court upon the questions submitted will result in such wise action on part of the respondents that further action on part of the court will not be necessary in the premises.