WAKEFIELD ET UX. *v.* LITTLE LIGHT, ETC. ET AL.

[No. 5, September Term, 1975.]

*Decided November 13, 1975.*

334

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*John G. Gill, Jr.,* for appellants.

*Elloyd E. Lotridge,* with whom was *John C. Eidleman* on the brief, for Gail Little Light, etc. et al., part of appellees. *Bertram E. Hirsch* for Crow Tribe of Indians, other appellee.

MURPHY, C. J., delivered the opinion of the Court.

This appeal draws into question the power of a state court to award custody of an American Indian child to non-Indian petitioners over the objection of the child's mother and of the Indian tribe to which she belongs, and requires an

examination of the jurisdictional relationships pertaining to child custody among the Indian tribes, the federal government, and the various states.

The relevant facts are these: M. Brent Wakefield and his wife Wanda (the Wakefields) were assigned as VISTA volunteers to the Crow Indian Reservation, Lodge Grass, Montana, when in March of 1972 they first observed Allie Little Light (Allie), a Crow Indian child, then three and one-half years of age, in a neglected and undernourished condition. The Wakefields learned that Allie's father was dead, that Gail Little Light (Gail), Allie's mother, was hospitalized in Billings, Montana, with serious injuries resulting from an automobile accident, and that Allie was left in the care of a white woman who lived on the reservation. The Wakefields thereafter spent considerable time caring for Allie and, over the course of eight months, they frequently visited Gail in the hospital. Eventually, the Wakefields discussed with Gail the possibility of adopting Allie, a proposal which Gail refused.

When their tour of VISTA service ended in late October of 1972, the Wakefields prepared to leave the reservation without Allie. On October 31, 1972, a little girl appeared at the Wakefield residence with Allie and said, "Gail says you can take him." That afternoon the Wakefields met with Gail and requested that she give her permission in writing. Gail did so, stating therein that the Wakefields could "take Allie with them and be responsible for him wherever they are, including out of state lines."

When Mrs. Janice Bille, a Bureau of Indian Affairs social worker, learned that Allie was to be taken off the reservation by the Wakefields, she petitioned the Crow Court of Indian Offenses (the Crow Court) to have Allie declared a neglected and dependent child and made a ward of the Crow Court. Gail joined in the petition and asked that the Wakefields "be appointed legal guardians of . . . [Allie] for a period of one (1) year." The Crow Court (Fred Knows Gun, Sr., tribal judge) granted the petition and issued "letters of guardianship" on November 1, 1972, appointing the Wakefields as Allie's "Special Guardians." The

Wakefields appeared before the Crow Court and agreed to support the constitution of the Crow Tribe and to perform their duties as Special Guardians according to law.

The Wakefields left the reservation with Allie and went to Arizona to visit Mr. Wakefield's parents; from there, they prepared and forwarded an "Affidavit of Consent and Waiver of Notice," to Gail, which she executed after conferring with Mrs. Bille. This document, dated December 12, 1972, recited that Gail consented to the appointment of the Wakefields as "guardians of the estate and person of Allie . . . , a minor, pursuant to the laws of the State of Maryland or of Arizona or of any other jurisdiction that may be chosen by . . . [the Wakefields]." The document also specified that Gail waived "any notice whatsoever of any proceedings in re the guardianship of the estate and person of Allie . . . ."

After leaving Arizona, the Wakefields came to Maryland with Allie in December of 1972 and took up residence. On July 16, 1973, they filed a petition in the Circuit Court for Anne Arundel County pursuant to Maryland Code (1973 Repl. Vol.), Article 16, § 66 (now Courts & Judicial Proceedings Article, § 3-602), to obtain temporary and permanent custody of Allie. Gail was served with notice of the Maryland proceeding and obtained counsel in Montana in October of 1973. Gail telephoned the Wakefields in October and requested that they return Allie to the reservation, but the Wakefields did not do so. In November of 1973, Gail answered the Wakefields' petition; she requested that it be dismissed and that Allie's custody be returned to her. The Crow Tribe of Indians thereafter sought the Court's permission to intervene in the Maryland proceeding and it was granted.

In June of 1974, Gail petitioned the Crow Court to terminate the guardianship previously granted by that court to the Wakefields. Counsel for the Wakefields was notified of Gail's petition but the Wakefields did not enter an appearance in the proceeding. By order dated July 10, 1974, the Crow Court (Fred Knows Gun, Sr., tribal judge) terminated the Wakefields' guardianship, granted

permanent custody of Allie to Gail, and ordered that the Wakefields surrender Allie to tribal officials. The order specified that Gail resided on the reservation, that the Wakefields' special guardianship was for a period of one year only and had expired, that the special guardianship had been granted solely on account of Gail's temporary ill health, and that Gail was now able to resume her parental responsibilities to Allie.

The Wakefields' petition for custody was heard in the Circuit Court for Anne Arundel County on July 12, 1974. Gail moved to dismiss the petition for lack of subject matter jurisdiction, contending that exclusive jurisdiction to determine Allie's custody was vested in the Crow Court on the reservation where Allie had remained domiciled. The chancellor reserved decision on the jurisdictional issue and heard testimony and arguments on the merits of the petition. On October 7, 1974, he dismissed the petition. After stating that "[t]he threshold question is whether this Court may act," the chancellor concluded:

> "In oppressing and exploiting a subjugated people, the United States has been a jealous sovereign. In a line of cases beginning with *Worcester v. Georgia,* 8 L.ed. 483 (1832), the federal government has denied the states any authority over Indian Reservations, or over Indians living on Reservations, in matters where the Indians had the right to govern themselves, *Williams* v. *Lee,* 3 L.ed. (2d) 251 (1959). And where an Indian Nation has a court as part of its government, that court's proceedings and judgments 'are on the same footing with proceedings and judgments of the courts of the territories of the Union, and are entitled to the same faith and credit,' *Mehlin* v. *Ice,* 56 Fed. 12 (8th Cir. 1893), at page 19.
>
> "These rules require this Court to deny the Petitioners the relief they seek, as the Court does not comprehend that the 1931 federal statute the Petitioners cite [46 Stat. 1494, An Act Relating to

the Adoption of Minors by the Crow Indians of Montana] enlarges this Court's jurisdiction without some complementary state legislation, and none has been cited." (Footnotes omitted.)

The Wakefields appealed to the Court of Special Appeals. Gail filed a petition for a writ of habeas corpus to obtain Allie's custody pending determination of the appeal, which was denied. On July 26, 1975, Gail removed Allie from Maryland without the Wakefields' consent and returned with him to the Crow Reservation in Montana. We granted certiorari prior to briefing or argument of the case in the Court of Special Appeals. *See* Code (1974) Courts and Judicial Proceedings Article § 12-203.

The Wakefields contend on appeal, as they did below, that the Circuit Court for Anne Arundel County had subject matter jurisdiction to grant the petition notwithstanding Allie's American Indian origin. They assert that state courts have jurisdiction to determine the custody of an Indian child where "significant acts or omissions" occur off the reservation. They say that all the complexities of subject matter jurisdiction involving Indians arise from transactions or incidents happening on or affecting those lands belonging to or set aside for the use of Indians or Indian tribes, but that an "off the reservation" Indian is subject to state law in exactly the same fashion as any other citizen of this State. The Wakefields point out that they are Maryland residents, that at the time of the hearing Allie had resided with them for almost 20 months, and was therefore domiciled in Maryland, and that he was brought into Maryland with full knowledge of the Crow Court and Tribe and with the express consent of the mother. In these circumstances, the Wakefields contend that no governmental interest of the Crow Tribe would be infringed if the Circuit Court for Anne Arundel County exercised subject matter jurisdiction to determine Allie's custody.

The Wakefields additionally claim that Congress expressly granted power to state courts to determine the status of Crow Indian children by enacting 46 Stat. 1494

(1931); that statute, the Wakefields urge, authorizes state courts to decree adoption of Crow Indians, and necessarily includes the lesser power to grant guardianship and custody.

The Wakefields also contend that the proceeding resulting in the Crow Court's order of July 10, 1974, was a sham specifically designed to frustrate the integrity of the Maryland court where the case had been in active litigation for almost one year. The Wakefields say that in these circumstances Gail was estopped from obtaining the Crow Court decree after having submitted herself to the jurisdiction of the Maryland court. They contend that in any event the Crow Court decree is not entitled to full faith and credit because, among other reasons, it did not involve the right of Indian self-government. Numerous other contentions based on federal and Maryland law are advanced by the Wakefields in support of their argument that the lower court had subject matter jurisdiction and therefore erred in dismissing the petition.

(1)

Section 8 of Article I of the Constitution of the United States gives implicit recognition to the distinct sovereign nature of Indian tribes, and to the federal preeminence in their relationship with non-Indians; that section provides that "[t]he Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." The early landmark decision of *Worcester v. Georgia*, 6 Pet. 515, 31 U. S. 515 (1832) reinforced the principle of Indian sovereignty:

> "The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil from time immemorial, with the single exception of that imposed by irresistible power. . . . The very term 'nation,' so generally applied to them, means 'a people distinct from others.' The constitution, by declaring treaties already made, as well as those to

> be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation,' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth; they are applied to all in the same sense."
> 31 U. S. at 559-60

In *Worcester*, a non-Indian residing on the Cherokee reservation was incarcerated pursuant to a Georgia law which required white persons so residing to register and swear allegiance to the state, and which authorized the enforcement of Georgia laws within the reservation. In striking down these state laws, Chief Justice Marshall sounded the keynote of federal preeminence:

> "The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves or in conformity with treaties and with the acts of Congress. *The whole intercourse between the United States and this nation is, by our constitution and laws, vested in the government of the United States.*
>
> "The act of the state of Georgia, under which the plaintiff in error was prosecuted is, consequently void, and the judgment a nullity."
> *Id.* at 561. (Emphasis added.)

In *United States v. Quiver*, 241 U. S. 602, 36 S. Ct. 699, 60 L. Ed. 1196 (1917), the Supreme Court held that existing federal criminal statutes did not reach adultery committed

by an Indian with another Indian on an Indian reservation. It said:

"At an early period it became the settled policy of Congress to permit the personal and domestic relations of the Indians with each other to be regulated, and offenses by one Indian against the person or property of another Indian to be dealt with, according to their tribal customs and laws." 241 U. S. at 603-04.

In recent years, as Indians have increasingly participated in American society outside the reservation, the Supreme Court has modified the principles of *Worcester* and its progeny to permit states to act "where essential tribal relations were not involved and where the rights of Indians would not be jeopardized." *Williams v. Lee,* 358 U. S. 217, 219-20, 79 S. Ct. 269, 3 L.Ed.2d 251 (1959). In *Williams,* the Supreme Court held that Arizona courts could not exercise jurisdiction over a civil suit by a non-Indian against an Indian, where the cause of action arose out of a commercial transaction on an Indian reservation. Writing for a unanimous Court, Justice Black said:

"Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U. S. at 220.

To like effect, *see Kennerly v. District Court,* 400 U. S. 423, 426-27, 91 S. Ct. 480, 27 L.Ed.2d 507 (1971); *Kake Village v. Egan,* 369 U. S. 60, 74-75, 82 S. Ct. 562, 7 L.Ed.2d 573 (1962).

The *Williams* test was reexamined in *McClanahan v. Arizona State Tax Commission,* 411 U. S. 164, 93 S. Ct. 1257, 36 L.Ed.2d 129 (1973); it was there held that a state had no jurisdiction to impose a tax on the income of reservation Indians which was wholly derived from reservation sources. The Court stated:

"[W]e reject the suggestion that the *Williams* test was meant to apply in this situation. It must be

remembered that cases applying the *Williams* test have dealt principally with situations involving non-Indians. . . . In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected."
411 U. S. at 179.

The most recent expression of Indian sovereignty by the Supreme Court appears in *United States v. Mazurie,* 419 U. S. 544, 95 S. Ct. 710, 42 L.Ed.2d 706 (1975), where, in the course of upholding a delegation of congressional authority to an Indian tribe over the introduction of alcoholic beverages into Indian country, the Court said:

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, . . . ; they are 'a separate people' possessing 'the power of regulating their internal and social relation. . . .' . . .

". . . [W]hen Congress delegated its authority to control the introduction of alcoholic beverages into Indian country, it did so to entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life. Clearly the distribution and use of intoxicants is just such a matter . . . ."
419 U. S. at 557.

That the federal government has carefully guarded the exercise of state civil jurisdiction over Indians is well indicated by 25 U.S.C. § 1322 (a) (1968); that statute authorizes a state, with the consent of the Indian tribe to be affected, to exercise jurisdiction over civil causes of actions between Indians, or to which Indians are parties, arising within the areas of Indian country affected by the assumption of state jurisdiction. Maryland has not enacted,

nor has the Crow Tribe consented to, enabling legislation in response to this federal statute, and there is no other federal law granting jurisdiction to the Maryland courts in matters involving custody of Indian children. Contrary to the Wakefields' position, 46 Stat. 1494 (1931) entitled "An Act Relating to the Adoption of Minors by the Crow Indians of Montana," does not grant general adoption jurisdiction over Crow tribal members to state courts. The statute provides that in order for a person adopted by a Crow Indian to inherit from its adoptive Crow Indian parent, the adoption must occur in a state court or under tribal procedures and be approved by the chief federal official on the reservation. The Act, by its terms, is not concerned with adoptions of Crows by non-Crows. *See* H. Rep. No. 2604, 71st Cong., 3d Sess. (1931); S. Rep. No. 1689, 71st Cong., 3d Sess. (1931).

We think it plain that child-rearing is an "essential tribal relation" within the doctrine espoused by the Supreme Court in *Williams v. Lee, supra.* That the Crow Tribe possesses the requisite judicial authority to protect and enforce such "essential tribal relations" is equally clear. The 1868 Treaty of Fort Laramie (15 Stat. 649) — the last and the most important treaty between the United States and the Crow Tribe — provided in Article II for a Crow Indian Reservation "for the absolute and undisturbed use and occupation" of the Crow Tribe, which it described as a "territory of the United States." Article II also affirmed the power of the Crow Tribe to govern Indians living on the reservation. The only restrictions on its powers of self-government agreed to by the Crow Tribe were contained in Article VI authorizing the United States to pass laws "on all subjects connected with the government of the Indians on said reservations . . . ."

Prior to its adoption in 1949 of a written constitution and bylaws pursuant to the Indian Reorganization Act, 48 Stat. 984 (1934), the Crow Tribe consented to the establishment of a two-tier court system as authorized by 25 Code of Federal Regulations, Part 11. See 25 U.S.C. §§ 476-79 (1934); 25 U.S.C. § 2 (1868). The Crow Court of Indian Offenses functions as a trial court of general civil and criminal

jurisdiction; the Crow Tribal Court of Appeals is vested with jurisdiction over appeals taken from judgments of the Crow Court of Indian Offenses.[1] The Crow Court of Indian Offenses primarily hears matters involving Crow tribal members, but it also has jurisdiction over suits involving members and nonmembers brought before the court on the agreement of both parties. 25 C.F.R. § 11.22C. The federal regulations also provide for tribal control over marriage, divorce, and tribal custom adoption. 25 C.F.R. §§ 11.27-11.30. Federal law grants "full force and effect" to tribal customs and ordinances in the determination of civil causes adjudicated in state courts. 25 U.S.C. § 1322 (c) (1968). Although such ordinances must be "adopted by an Indian tribe in the exercise of any authority which it may possess" and must be consistent with the state's civil law, the statute manifestly indicates the regard in which traditional, unwritten Indian custom is held. See also 25 C.F.R. § 11.23 (Courts of Indian Offenses apply ordinances, customs, and usages of the tribe in all civil matters). The federal regulations supplement tribal customs and usages in the area of child welfare. See 25 C.F.R. § 11.30 (determination of paternity and support); § 11.36C (juvenile delinquency); § 11.41 (abduction); § 11.64C (failure to support dependent persons); § 11.65 (failure to send children to school); § 11.66 (contributing to the delinquency of a minor). That the absence of written provisions in the Crow law respecting guardianship or custody of Crow children did not significantly impair the tribe's judicial capability to act in such matters is, we think, abundantly clear.

### (2)

Despite the power of the Crow tribal courts and the implications of the *Williams* "infringement" test, there is little case authority bearing directly on the matter of state jurisdiction over the domestic relations of Indian tribal

---

1. The judges of these courts are appointed for four-year terms by the Commissioner of Indian Affairs, subject to confirmation by a two-thirds vote of the tribal council. 25 C.F.R. ₹ 11.3.

members. The earliest case, *In re Lelah-Puc-Ka-Chee*, 98 F. 429 (D. Iowa, N.D. 1899), concerned an Indian child whose non-Indian guardian had been appointed by a state court. A writ of habeas corpus was brought on the child's behalf because, as a consequence of the guardianship, she was allegedly being forced to attend an off-reservation Indian training school against her wishes. The federal court found that the state court had no authority to appoint guardians for Indian children living on the reservation. Basing its decision on the doctrine of federal preeminence, the court said:

> "As I understand it, the purpose of the cession by the state to the national government of the jurisdiction over the reservation and the Indians living thereon was to center in the one government the duty of taking charge of these Indians, and thereby to avoid the evils that would necessarily arise from a divided control over them. . . ."
> 98 F. at 432.

The court made it clear that its holding was not intended to apply to ". . . individuals who may have severed their tribal relations, or who have become incorporated into the citizenship of the state in which they reside . . . ." *Id.* at 433. *See also Peters v. Malin,* 111 F. 244 (C.C.N.D. Iowa 1901).

In two cases decided the same day, a divided Supreme Court of Washington held that state juvenile courts had no jurisdiction to declare, as "dependent," Indian children residing on a reservation. In *State v. Superior Court,* 57 Wash. 2d 181, 356 P. 2d 985 (1960), the children had been abandoned by their fathers, and removed by state authorities from a grossly neglectful mother. The child in *In re Colwash,* 57 Wash. 2d 195, 356 P. 2d 994 (1960), had been abandoned by both parents on the reservation, and had for almost two years been a ward of the state court. No Indian claimed jurisdiction for the tribal court and no federal officer claimed jurisdiction for any federal agency during this time. The state court, on its own motion, dismissed its

custody for lack of jurisdiction and its judgment was affirmed on appeal on the ground that no state jurisdiction vested beyond that expressly granted by Congress, assented to by the Indians, or authorized by the state legislature pursuant to a federal enabling statute.

The first reported case where a state court assumed custody jurisdiction over an Indian child was *In re Cantrell*, 159 Mont. 66, 495 P. 2d 179 (1972). There the Montana Supreme Court upheld state court jurisdiction of an Indian child, a member of the Fort Peck Tribes, who had been abandoned off the reservation by its parents for more than one year. At the time jurisdiction was assumed the child was apparently domiciled on the reservation. The Montana court distinguished *Williams* and other Supreme Court cases on the ground that the abandonment occurred off the reservation and continued for over a year. *See also United States ex rel. Cobell v. Cobell*, 503 F. 2d 790 (9th Cir. 1974), a case involving the custody of an Indian child, where the federal court concluded that jurisdiction was vested in the state court because the Indian tribe had ceded jurisdiction to it.

A federal district court in a state which, like Maryland, has no state enabling legislation to complement 25 U.S.C. § 1322 (a), held in *Wisconsin Potowatomies, Etc. v. Houston*, 393 F. Supp. 719 (D.W. Mich., N.D. 1973), that the state court was without jurisdiction to make an award of custody of Indian children. There, a full-blooded Indian married a white woman. They and their children had been living sporadically on and off the reservation. Marital problems arose, the wife and children moved off the reservation, the husband followed them, and killed his wife and himself. The Michigan Department of Juvenile Services filed a petition in a state court for custody of the children, claiming that they were dependent and neglected, and it was granted. Approximately six months thereafter, the Indian tribe filed an action in federal court, claiming that the state court lacked jurisdiction.[2] The federal court weighed the

2. Whether the Indian tribe intervened, or attempted to intervene, in the state court proceeding cannot be ascertained from the court's opinion.

respective interests of the state and the Indian tribe in the children, in light of the Michigan custody statute and the case law concerning Indians. It concluded that "[i]f tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right, within its own boundaries and membership, to provide for the care and upbringing of its young, a *sine qua non* to the preservation of its identity." 393 F. Supp. at 730. It held that the Michigan jurisdictional basis of physical presence in custody cases was not suitable because "deeper" issues were involved, and that "the only rational approach is to determine the domicile of the children at the time their physical custody was gained" by the state court. *Id.* at 731. The court found that the children's domicile remained on the Indian reservation and that the Indian tribe thus retained exclusive jurisdiction to determine the matter of their permanent custody since the tribe had a tradition or custom of child care and had not waived its right to assert jurisdiction.

### (3)

While it is thus clear that the cases have placed restrictions on the exercise of state jurisdiction in areas where essential tribal relations are involved and tribal rights would be jeopardized, or where state action infringed on the right of reservation Indians to make their own laws and be ruled by them, *Williams v. Lee, supra,* as a general proposition Indians who find themselves outside the reservation have the same rights and responsibilities, and are subject to the jurisdiction of state courts in the same manner and to the same extent as other state citizens. *Mescalero Apache Tribes v. Jones,* 411 U. S. 145, 93 S. Ct. 1267, 36 L.Ed.2d 114 (1973). In holding that New Mexico could impose a gross receipts tax on a ski resort operated by an Indian tribe on off-reservation land leased from the federal government, the Supreme Court said in *Mescalero Apache Tribes:*

"[W]e reject . . . the broad assertion that the Federal Government has exclusive jurisdiction over

the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise '[w]hether the enterprise is located on or off tribal land.' Generalizations on this subject have become particularly treacherous. The conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester v. Georgia*, . . ., has given way to more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government. . . . The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interefere with reservation self-government or would impair a right granted or reserved by federal law. . . ."
411 U. S. at 147-48.

In a similar spirit of tripartite balancing, other courts have begun to examine the state interests in Indian children found off the reservation. As the court said in the *Cobell* case (*supra*):

"The State of Montana's interest in the welfare of the Cobell children is beyond dispute. The children were domiciled in the state and enrolled in the state public school system when Joan and Henry Cobell began their divorce proceedings. Presence, domicile and jurisdiction over the parents are well recognized bases for the assertion of jurisdiction to determine child custody. Restatement (Second) Conflict of Laws § 79 (1971) . . . ."
503 F. 2d at 794.

The interests of the tribe and the state were also balanced in *Wisconsin Potowatomies,* the issue there aptly being phrased as follows:

"If then, Indians are to be accorded such independence and sovereignty within the limits of

> their reservation, and if on the other hand, they subject themselves to the benefits and obligations of state law when without, the question becomes at what point the transformation from one to the other is accomplished."
> 393 F. Supp. at 730.

That Maryland also has cognizable jurisdictional interests in this case is clear. Pursuant to the Crow Court decree of November 1, 1972, Allie had been in the Wakefields' custody and lived in this State from sometime in December of 1972 until the custody petition was filed on July 16, 1973. Thereafter he was enrolled in Maryland public schools, and continued to live in the State until July 26, 1975. The Crow Court did not have before it a petition to dissolve the guardianship granted to the Wakefields until June 11, 1974, more than seven months after the expiration of its 1972 decree.

The traditional Maryland method of determining subject matter jurisdiction in child custody cases has been to identify the domicile of the child. *See, e.g., Miller v. Miller,* 247 Md. 358, 231 A. 2d 27 (1967); *Naylor v. Naylor,* 217 Md. 615, 143 A. 2d 604 (1958). By Chapter 265 of the Acts of 1975 (Code, Art. 16, § 184-207) jurisdiction of Maryland courts to make child custody determinations was substantially broadened to encompass considerations other than the child's domicile. Under the provisions of that Act, which became effective on July 1, 1975 during the pendency of this appeal, jurisdiction to make a child custody determination may attach, *inter alia,* where a child lives within this State with a person acting as a parent for six months prior to the filing of the Maryland custody petition. But while this Act, and Supreme Court cases such as *Mescalero Apache Tribes v. Jones, supra,* may illustrate Maryland's significant interests with Allie's custody, other Supreme Court cases, including particularly *Williams v. Lee, supra,* and federal statutes such as 25 U.S.C. § 1322 (a), *supra,* recognize the significant interests of Indian self-government. Weighing these competing considerations in light of the unique facts in

this case, including in particular that the Crow Court had continuing jurisdiction over Allie's custody, which it last validly exercised two days prior to the Maryland custody proceeding, and taking into account the limited duration of the Wakefields' guardianship, and considering that there can be no greater threat to "essential tribal relations," and no greater infringement on the right of the Crow tribe to govern themselves than to interfere with tribal control over the custody of their children, we agree with the conclusion expressed in *Wisconsin Potowatomies* that in determining whether to exercise subject matter jurisdiction in such circumstances, the only rational approach is to determine the domicile of the Indian child. By using the Indian child's domicile as the state's jurisdictional basis, the Indian tribe is afforded significant protection from losing its essential rights of child-rearing and maintenance of tribal identity.

That the domicile of a minor child is that of the parent with whom he lives is well settled. *See Ross v. Pick,* 199 Md. 341, 86 A. 2d 463 (1952). Thus, Allie's domicile prior to the tribal court decree of November 1, 1972 was clearly on the Crow Indian reservation where his mother resided. Although the Crow Court decree of November 1, 1972 contained no express indication of the extent of the Wakefields' authority over Allie's domicile, it appears that the "special guardianship" was limited to one year. Indeed, the special nature of the Crow Court decree was explained in expert testimony in the proceedings below by Marjorie Wilkinson, an associate judge of the Crow Court of Indian Offenses. She testified that the Tribal Court could not give custody for more than a one-year period, and that "if it's going to be longer than a year, they have to come back and renew it in the tribal court." The Wakefields never returned to the reservation with Allie during or after this period. In addition, the guardianship petition which Gail executed specifically requested the appointment of a legal guardian for a period limited to one year. And, as we have previously indicated, the Crow Court decree of July 10, 1974 terminating the Wakefields' special guardianship, entered

by the same judge who signed the earlier decree, stated that that guardianship was for a one-year period and that the Wakefields so understood. Although the Wakefields disputed this understanding of the duration of the November 1, 1972 decree, the special vestiges of Indian sovereignty concerning "essential tribal relations" like child-rearing and tribal identity reinforce the policy not to easily imply the guardian's authority to shift domicile to another state. *See* Restatement, Conflict of Laws (2d) § 22 (2) (1969), comment h. We think, in the circumstances of this case, that Allie's domicile remained on the reservation in Montana, and that the Maryland court properly declined to interfere with the jurisdiction over his custody already vested in the Crow Court of Indian Offenses.[3]

## (4)

The Wakefields raised three other arguments which merit discussion. First, they contend that the facts of this case indicated that Gail abandoned Allie. In *Logan v. Coup,* 238 Md. 253, 258, 208 A. 2d 694 (1965), we defined child abandonment as:

> "any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely."

Assuming that a legal abandonment would have conferred subject matter jurisdiction on the lower court, it is clear that there was no abandonment in this case. The facts indicate little more than two weeks passed between the expiration of the tribal decree on October 31, 1973 and Gail's intervention in the Maryland custody proceeding. At no time could her

---

3. We entertain no doubt that a Maryland court should exercise jurisdiction in an emergency over a neglected or dependent Indian child found in Maryland, without regard to his domicile. See Wisconsin Potowatomies, Etc. v. Houston, 393 F. Supp. at 730; Code, Art. 16, § 186 (a) (3).

actions be construed to evince a settled purpose to relinquish all parental claims to Allie.

The Wakefields also argued that the "Affidavit of Consent and Waiver of Notice," which Gail executed, conferred subject matter jurisdiction in the Maryland courts. We cannot agree. That a party may not confer subject matter jurisdiction on a court by consent is well settled. *Mayor v. Shearwater Sailing*, 265 Md. 280, 288 A. 2d 887 (1972); *Meyer v. Henderson*, 88 Md. 585, 42 A. 241 (1899).

The Wakefields also contend that the Supreme Court case of *DeCoteau v. District County Court*, 420 U. S. 425, 95 S. Ct. 1082, 43 L.Ed.2d 300 (1975), holds that state courts have the right to determine the custody of an Indian child where certain significant acts or omissions occurred off the reservation. In that case dependency proceedings had been initiated in a state court to remove an Indian child from a neglectful Indian mother. In a habeas corpus proceeding filed in the state court, the mother alleged that the state court had no jurisdiction and requested that her child be released from the foster home in which he had been placed. The central issue in the case was whether the lands upon which half of the acts of parental neglect took place were nonreservation lands. In holding that these lands were not part of the reservation, the Supreme Court held that the state court had civil and criminal jurisdiction over conduct of members of the tribe occurring thereon. The Court did not address the jurisdictional issue presented in the case, and thus the Wakefields' reliance on *DeCoteau* is misplaced. *See* 420 U. S. at 429, n. 3.

Since Allie's domicile remained within the boundaries of the Crow Indian reservation in Montana, we think the lower court correctly concluded that in the circumstances of this case it should not exercise subject matter jurisdiction.

*Order affirmed; costs to be paid by appellants.*